1837.

IN THE MATTER
OF THE BRICK
PRESBYTERIAN
CHURCH.

In the matter of the petition of the Corporation of the BRICK PRESBYTERIAN CHURCH in the city of New-York.

---

*It would seem*, that on an application, by a religious corporation, for leave to sell its church and grounds, it is not absolutely necessary for the applicants to state that they have found a purchaser and fixed upon a new site; a conditional order can be made.

A purchase of a pew gives no right to the soil; and the interests of a pew-holder create no bar to a sale of the church and grounds.

The heir of a deceased person has a right of action where the monument or tomb of his ancestor is defaced; but he has no right of property in the body.

Where a religious corporation has received a fee of the ground on which the church stands and of the graveyard adjoining, subject only to the keeping the whole to pious uses, such religious corporation can grant any length of lease or a fee of portion of the ground for vaults. The grantees will thereby get a fee; and the property cannot be sold while they object to it.

---

PETITION to sell the church and lands of the petitioners to the mayor, aldermen and commonalty of the city of New-York; and to apply the purchase moneys to the buying of other ground and the erection of another church.

The petitioners showed they were the possessors of certain land and of a church edifice, under a grant or perpetual lease from the corporation of the city of New-York at a nominal rent; and which grant contained a condition that the land should not be appropriated, at any time, to secular uses. Also, that a large portion of the families of the church resided at a distance from it, and the changes of residence were increasing. That the corporation of the city of New-York had proposed to treat with the petitioners for a surrender of the lease and premises; and it had been resolved, at a meeting of the pew-holders of the church, upon consideration to make such a sale, by the trustees, at a sum not less than one hundred and fifty thousand dollars. That, in the event of a sale, the removal of the remains of bodies interred in the church grounds would become necessary. Prayer for a sale, accordingly, upon such terms as might be agreed upon between the petitioners and the corporation; and that the said petitioners might

*October* 24, 25, 26. 1837.

*Religious Corporation. Sale. Pew. Vault.*

be authorized to apply the moneys to arise from such sale in the purchase of other ground in the city, and to the erection of another church edifice in such manner and at such times as the petitioners should conceive to be most for the interest of the church and congregation; and also apply, in their discretion, any portion of the said moneys to the removal of the remains of bodies interred, and in the payment of debts due from the church.

The resolution of the corporation to purchase was couched in these words : " Resolved, that the surrender of the lease of the block of land bounded by Beekman, Nassau and Chatham streets and now held by the trustees of the Brick Church be purchased, provided the same can be obtained for a sum not exceeding one hundred and fifty thousand dollars, and upon terms otherwise favorable to the corporation. Adopted by the board of assistants, May 9th, 1836. Adopted by the board of aldermen, October 24. Approved by the mayor, October 31st, 1836."

A portion of the congregation were opposed to a sale ; and the court directed a reference to a master to take testimony and return the same, with his report.

This had been done ; and the case now came before the court on the master's report and testimony and exhibits connected with it. By the report, it appeared that many pew-holders objected to a sale ; and that there were vault-holders who would not consent. The latter claimed through deeds, which are fully referred to in the opinion of the court.

Mr. *D. Lord, Jr.* and Mr. *H. Holden,* in support of the petition.

Mr. *Benjamin Clark* and Mr. *Charles Edwards,* against it.

THE VICE-CHANCELLOR :—The matter before the court, as it now appears upon the master's report and the mass of testimony connected with it, presents questions which go first to the right of the corporation to sell ; and secondly, to the expediency of a sale and consequent removal of the church ?

I shall, however, first notice the necessity of coming to this

court for leave to sell; and, as to the power of the court of chancery in the case.

By a law passed in the year one thousand eight hundred and six, and continued in the statute book to this day, it is declared to "be lawful for the chancellor of this state, upon the application of any religious corporation, in case he shall deem it proper, to make order for the sale of any real estate belonging to such corporation, and to direct the application of the moneys arising therefrom by the said corporation, to such uses as the same corporation, with the consent and approbation of the chancellor, shall conceive to be most for the interest of the society to which the real estate so sold did belong:" 3 R. S. 298, § 11.

The object and necessity of this law is explained by the chancellor in the case of *The Reformed Protestant Dutch Church in Garden Street* v. *Mott et al.*, 7 Paige, 77.

In carrying out the intention of the law, a sound discretion must be exercised. The power to make an order for a sale is given in cases where the Chancellor "shall deem it proper"; and, not otherwise.

It has been said, in the present case, that it is "improper" to allow an order for a sale, because the corporation of the city of New-York, the proposed purchasers, have not actually agreed to buy. But I understand the fact to be otherwise; and the trustees only ask for a provisional order, in the first instance, authorizing them to sell at a price not less than one hundred and fifty thousand dollars, and so that if a purchaser cannot be found at that sum, there will be no sale. If one be found and an actual agreement is made, the court, by a subsequent order, can approve and confirm it and direct the application of the proceeds.

Another objection raised against an order for a sale is, that no new site or location for the church is fixed upon by the trustees; that they have no particular place in view to remove to. Here, again, I see no insuperable difficulty. A conditional order may be made in the first instance. The trustees do not propose to give possession of the old church, but to reserve the use of it for public worship, until they can procure a site and erect a new edifice.

The case, then, resolves itself into the question, whether

1837.

IN THE MATTER OF THE BRICK PRESBYTERIAN CHURCH.

1837.

IN THE MATTER
OF THE BRICK
PRESBYTERIAN
CHURCH.

the trustees have a right and can lawfully sell, without the consent of all the pew holders, but especially of the vault owners; and if the trustees have such right, then, as to the expediency of the measure? The first of these questions, that is, as to the right, affects the interest of some who are not, at present, members of the congregation, and have no connection with the church as a spiritual body; and the other, as to the expediency of a sale, affects those exclusively who are in the latter point of view connected with the church as stated hearers, communicants and worshippers, whether they be pewholders or not.

The objections to a sale are taken in behalf of some pewholders who do not consent, and also by persons who claim to be owners of vaults; and it is insisted that no sale or alienation of the property, by which it is to be converted to secular purposes, can be made, without infringing vested legal rights.

As to pew-holders: what are their legal rights? In England, so far at least as respects the established church, every parishioner has a right to a seat in the church. Pews are, there, a matter altogether of ecclesiastical regulation. It is the duty of the churchwardens to distribute them in the most convenient way so as to give each parishioner a seat. The grant or faculty from the bishop may confer a greater right, as will be found sufficiently explained in the case of *Heeney* v. *St Peter's Church*, 2 Edwards's Ch. Rep. 608. A clear summary of the law will also be found in the notes to *Corven's Case*, 12 Coke 105, (Fraser's edit.)

Although pews are a matter of ecclesiastical regulation, yet the common law determines the right and protects a party in the enjoyment of it, by affording an action on the case for disturbance, not of trespass: because he has not the exclusive right.(a)

Our church establishments, however, stand upon a different footing. Here we have no parish churches. With us, they are corporations aggregate, made so by law. The temporal concerns are managed by trustees, who have power to dispose of the pews by sale, and by letting them out to hire, fixing

(a) See able articles in relation to pews: London Law Magazine, vol. 1, p. 1; also same vol. p. 574.

the amount of rent so as to produce a revenue. It is all a matter of bargain, and entirely conventional between the trustees and those individuals who wish to become hearers or members of the society and to have seats in the church.

The purchase of a pew gives a more permanent right than a mere hiring. True, a purchaser as well as a hirer, pays a rent or assessment for the support of the establishment, but, still, the purchaser has a property which is transmissible. However, it is not with us, any more than it is in England, a right or interest in the soil which a purchaser acquires. His possession is not a possession of real estate. This will be found to be the doctrine laid down by Woodward J., in *Freligh* v. *Platt*, 5 Cowen, 494 ; and so I held the law to be in *Heeney* v. *St. Peter's Church*, supra.

If, then, such be the law as to the pew-holder even by purchase, that his interest is in the *use* of a particular seat or seats in the building and not in the land, and that such use is limited in point of duration so long only as the church edifice stands, there can be no valid legal objection to the right of trustees to pull down and remove, whenever it shall be found expedient and proper. The cases of *Wentworth* v. *Inhabitants of the First Parish in Canton*, 3 Pick. 344, and *Howard* v. *The First Parish in North Bridgewater*, 7 Ib. 138, are to this effect. And should it be done even where there is not an absolute necessity, compensation can be made.

An order sanctioning a sale, for the purpose of removal and of re-building the church edifice elsewhere, can be made, as was suggested in the case of *Heeney* v. *St. Peter's Church*, without prejudice to the legal rights of pew-holders in the new building wherever located. The corporate body is amenable to the laws, at the suit of any party aggrieved ; and a pew-holder, if he has been a corporator, will be so still, even after a change of location.

The objection, on the ground of the legal rights of pew-holders, I consider not insuperable to the granting of the present application.

Then, as to the vault owners : what are their rights ?

In order to determine the point embraced by this question, it will be necessary to look into the grants under which the

property is held and through which ground for vaults has been disposed of.

In the year one thousand seven hundred and sixty-six, the corporation of the city of New-York, upon the application of certain persons who were then the ministers, elders, deacons and trustees of the English Presbyterian Church of the city of New-York, granted to those persons by name and in their official capacities as such, in fee, the land in question, expressly for the purpose of erecting thereon a church edifice and using the ground for a cemetry or church yard, reserving a quit-rent of forty pounds. The deed was made with a condition that if within ten years the ground should not be enclosed and built upon or used as a cemetry or if, at any time thereafter, it should be diverted and appropriated to private secular uses or the rent should be in arrear, the grant was to be void. This condition had been complied with.

Sundry conveyances and transfers were afterwards made and whereby the title became vested in the present corporation of the Brick Presbyterian Church in the year one thousand eight hundred and nine, at which time they became a distinct and separate corporation under the general law. But long before this and while the title remained in the original grantees and the property was under the direction of the trustees of the First Presbyterian Church, they passed two resolutions, of which the following are copies :

1769, May 31. "Mr. McDougall reports that several persons have applied to him to know whether they could have the privilege of purchasing ground for burying vaults in the new church yard : whereupon the trustees *resolve* to grant that privilege to such persons as apply for the same, on the same terms, of the same dimensions as such are granted by the Dutch consistory."

" *June* 5. Mr. Livingston reports that in pursuance of the order of the board, he has inquired of the Dutch consistory the dimensions and terms on which they grant vaults in their church yard, which is as follows, viz : for vaults thirteen and a half feet by ten and a half in the clear, with room for the steps, they grant in fee for ever for £15, subject to all the usual charges of burial, except paying for the ground. *Resolved*

that the board will grant the privilege of vaults in the new church on the aforesaid terms."

In pursuance of this resolution a number of vaults were granted; and among others, one to John DeWitt and John Quackenboss, by deeds of lease and release dated the twenty-second and twenty-third days of November, one thousand seven hundred and seventy-one, for the consideration of fifteen pounds paid by them therefor. The release purports to be made by the then present ministers, elders and trustees, by apt words of grant, bargain, sale and release to DeWitt and Quackenboss their heirs and assigns for ever, and is: for all that small parcel of ground under the earth, &c., in the cemetry or church yard of the New Presbyterian Church, &c., bounded south-easterly by the vault of Thomas Arden, north-westerly by a vault of Thomas Grant, and which was already converted into a vault for the interment of the dead; and also a way or liberty to pass and re-pass to and from the same and to open the ground for the purpose of making interments in the vault according to the directions of the said DeWitt and Quackenboss their heirs and assigns; and also free liberty to cover the passage or entry into the same with a stone even with the surface of the ground, &c., adding general words; to hold the said vault, tract of land and premises, with the appurtenances, to the parties of the second part their heirs and assigns, to the only proper use and behoof of the said parties their heirs and assigns for ever. (a)

(a) Copy of the deed: "*This Indenture*, made the twenty-third day of November, in the year of our Lord one thousand seven hundred and seventy-one, between John Rogers and Joseph Treat, clerks, present ministers of the English Presbyterian Church of the city of New-York, according to the Westminister confession of faith, catechisms and directory, agreeably to the present established church of Scotland, Garrit Noel, Nathaniel McKenley, Peter Van Brough Livingston, John Smith, Thomas Jackson, John Stevens and Peter Riker, the present elders of the said church, and Thomas Smith, Peter R. Livingston, Joseph Hallett, John Lasher, Jr., William Smith, John Dunlap and John Morin Scott, trustees of the said church, parties of the first part, and John DeWitt and John Quackenboss of the second part. *Whereas* the mayor, aldermen and commonalty of the city of New-York, by lease and release, under the common seal of the said city, dated the twenty-fourth and twenty-fifth days of February, in the year of our Lord one thousand seven hundred and sixty-six, did convey unto the said parties of the first part their heirs and assigns all that tract of land in the common of the said city, beginning where the line of the north-

Doctor Nicholas Quackenboss now holds this deed, and claims to be the owner of the vault as heir of his father and grandfather, the grantees, both of whom were interred there.

In looking further into the minutes of the trustees of the First Presbyterian Church, we find the following resolution and orders :

"1786, June 27. *Resolved,* that John Ray, Joseph Hallett and Ebenezer Hazard be a committee for the purpose of laying out the ground in the yards of the two churches for vaults and to dispose of the spaces so laid out to such persons

easterly side of Beekman street is intersected by the line of the westerly side of Kipp street, and runs thence north fifty-two degrees, east two hundred feet, thence north thirty-two degrees, west sixty feet in the course of George street towards the commons, and then from the end of the said sixty feet, south seventy-eight degrees, west two hundred and fourteen feet, and thence south thirty-two degrees, east one hundred and fifty-one feet to the place of begin-ning. *Now this indenture witnesseth* that the said parties of the first part for and in consideration of the sum of fifteen pounds, lawful money of New-York, to them in hand paid, by the said parties of the second part, the receipt whereof they do hereby acknowledge, have granted, bargained and sold, aliened, re-leased and confirmed and do hereby grant, bargain and sell, alien, release and confirm unto the said parties of the second part, (in their actual possession now being by virtue of a lease for a year to them thereby made by indenture dated yesterday, and of the statute for transferring uses into possession,) their heirs and assigns for ever, all that small parcel of ground under the earth part of the land so as aforesaid granted to the parties of the first part, which said parcel of ground hereby granted or meant to be granted is in the cemetry or church yard of the New Presbyterian Church, and nearly fronts the north-westerly door of the said church and is bounded south-easterly by the vault of Thomas Ar-den, on the south-west by the north-easterly side of Beekman street, on the north-west by a vault of Thomas Grant and others, and is already converted into a vault for the interment of the dead, and also a way or liberty to pass and re-pass to and from the same, and to open the grounds for the purpose of making interment in the same vault, according to the directions of the said John DeWitt and John Quackenboss their heirs and assigns, and also free liberty to cover the passage or entry into the same vault with a stone or stones even with the surface of the ground in that part of the said church yard and contiguous thereto ; and the reversion and reversions, remainder and remain-ders, rents and profits of the same with the appurtenances. *To have and to hold* the said vault, tract of land and premises hereby granted and every part thereof, with the appurtenances, to the said parties of the second part their heirs and assigns, to the only proper use and behoof of the said parties of the second part, their heirs and assigns for ever. *In witness whereof* the parties to these presents have hereunto interchangeably set their hands and seals the day and year first above written."

(Executed and a receipt for the consideration money added.)

as may apply for the same at the price of £15 each lot. *It is* **1837.**
*further ordered*, that deeds for the same be prepared, and that
the president affix the seal of the corporation thereto."

1788, August 22. "*Ordered*, that the treasurer prepare
leases for 999 years to Thomas Ash and William Ash and
William Irvin for pieces of ground for vaults in the new church
yard, each —— feet by —— feet."

Leases were accordingly executed. The one to Thomas
Ash and William Ash is dated the third of September, one
thousand seven hundred and eighty-eight, and is from the
" corporation of the First Presbyterian Church of the city of
New-York ;" the consideration is fifteen pounds, and it de-
mises to the parties, Thomas Ash and William Ash, their heirs
and assigns thirteen and a half feet by ten feet and a half of
ground, for the purpose of constructing a vault, being part of
the cemetry ; the meets and bounds are given ; the *habendum*
is for nine hundred and ninety-nine years to them and their
heirs and assigns, rendering one ear of Indian corn if lawfully
demanded ; and a proviso is added that the ground is not to be
applied or appropriated to any use or purpose other than inter
ment of the dead. (*b*)

(*b*) Copy of the Instrument: "This Indenture made the third day of Septem- [L. s.]
ber, in the year of our Lord one thousand seven hundred and eighty-eight, be- By order of the
tween the corporation of the First Presbyterian Church in the city of New-York corporation,
of the first part and Thomas Ash and William Ash of the said city of the second David Cation,
part, *Witnesseth*, that the said corporation for and in consideration of fifteen Clerk.
pounds well and truly paid by the said Thomas Ash and William Ash before
the sealing and delivery hereof, (the receipt whereof is hereby acknowledged,)
have demised, set and to farm let, and by these presents do demise, set and to
farm let unto the said Thomas Ash and William Ash and to their heirs and
assigns, a piece or parcel of ground thirteen feet six inches in length, and ten
feet six inches in breadth, for the purpose of constructing a vault for the inter-
ment of the dead : (being part of the cemetry or burying-ground belonging to the
Presbyterian Church and adjoining to Beekman street in the city of New-York
aforesaid,) which piece of ground is situate in front of the New Presbyterian
Church towards Beekman street, and is bounded on the westerly side by a
vault erected by Willlam Irving, on the northerly side by the church, easterly by
ground belonging to the said party of the second part, and southerly by Beek-
man street, *To have and to hold* the above demised piece or parcel of ground
to them the said Thomas Ash and William Ash their heirs and assigns for and
during the full end and term of nine hundred and ninety-nine years, to be com-
puted from the day of the date of these presents : yielding and paying annually
to the said corporation of the First Presbyterian Church, and to their succes-

1837.

IN THE MATTER
OF THE BRICK
PRESBYTERIAN
CHURCH.

One of the heirs of a lessee produces this lease and claims to hold under it.

The great question, with respect to these instruments, is : what rights do they confer ? Do they confer a mere right of interment, an exclusive right to inter in those particular spots, or is it a right to the land—an estate or interest in the land itself to endure for ever in the one case, and, until the expiration of the term, in the other ?

This is a question not entirely free from difficulty.

It is argued that, with the exception of the deed and lease, conferring an exclusive right to bury within the walls of the vaults, it is a right of no greater extent and of no longer duration than is conferred when the privilege of burying in a grave or a public vault is granted or sold, and that such a grant confers no right of property in the soil, but only a temporary use. And the case of *Gilbert* v. *Buzzard and Boyer*, 3 Phillimore, 335, is cited, as containing a full explanation of the law on the subject of interments. That case certainly has an important bearing upon the one now before the court. The plaintiff, there, claimed the right to bury his deceased wife in the church-yard in an iron coffin, on paying the usual fees. The churchwardens refused to put the iron coffin in the ground upon any terms, on account of its durability. This, necessarily, led to the consideration of what right was acquired by interment in a grave—whether it was an exclusive right to the spot for ever, or one which terminated with the decay of the

sors, one ear of Indian corn, if the same shall be lawfully demanded. Provided always that neither the said parties of the second part their heirs or assigns shall apply or appropriate the piece or parcel of ground above demised, or any part thereof, to any use or purpose whatsoever, other than the interment of the dead, during the full term above mentioned. *In testimony whereof*, the said corporation have caused their common seal to be hereunto affixed, and the said Thomas Ash and William Ash have hereunto set their hands and seals the day and year first above written.

THOMAS ASH,    [L. S.]

WM. ASH.    [L. S.]

Signed, sealed and delivered by the said Thomas Ash and William Ash, (the words six inches being first twice interlined between the seventh and eighth lines,) in presence of

ADAM GILCHRIST.

EBEN HAZARD.

body. If the former, then it was immaterial in what manner the body was deposited, whether enclosed in wood, iron or lead; but if the latter, then it was important that the ground should not be occupied with durable coffins of metal. And here it will be necessary for me to quote somewhat at large from the very eloquent opinion of Sir William Scott. After an historical sketch of the ancient and modern modes of interment, and observing upon the comparative durability of materials, the learned judge thus proceeds :

1837.

IN THE MATTER
OF THE BRICK
PRESBYTERIAN
CHURCH.

"It being assumed that the court is justified in holding this opinion upon the fact of comparative duration, the pretension of these coffins to be admitted on equal terms must resort to the other proposition, which declares that the difference of duration ought to make no difference in the terms of admission. Accordingly it has been argued, that the ground once given to the interment of a body is appropriated for ever to that body ; that it is not only the *domus ultima*, but the *domus æterna* of that tenant, who is never to be disturbed, be the condition of that tenant himself what it may. It is his for ever; and the insertion of any other body into that space, at any other time, however distant, is an unwarrantable intrusion. If these positions be true, the question of comparative duration sinks into utter insignificance.

"In support of them it seems to be assumed, that the tenant himself is imperishable ; for, surely, there cannot be an inextinguishable title, a perpetuity of possession, belonging to a perishable thing: but obstructed in a portion of it, by public authority, the fact is, that "man" and "for ever" are terms quite incompatible in any state of his existence, dead or alive, in this world. The time must come when his posthumous remains must mingle with and compose a part of the soil in which they have been deposited. Precious embalmments and splendid monuments may preserve for centuries the remains of those who have filled the more commanding stations of human life : but the common lot of mankind furnishes them with no such means of conservation. With reference to men, the *domus æterna* is a mere flourish of rhetoric. The process of nature will resolve them into an intimate mixture with their kindred earth, and will furnish a place of repose for other occupants of the grave in succession. It is objected

that no precise time can be fixed at which the mortal remains, and even the chest which contains them, shall undergo the complete process of dissolution; and it certainly cannot, being dependent upon circumstances that differ, upon difference of soils and exposure, of climate and seasons : but observation can ascertain it sufficiently for practical use. The experience of not many years is required to furnish a certainty sufficient for such purposes. Founded on these facts and considerations, the legal doctrine certainly is, and remains unaffected, that the common cemetery is not *res unius ætatis*, the exclusive property of one generation now departed; but is likewise the common property of the living, and of generations yet unborn, and subject only to temporary appropriation. There exists a *right of succession* in the whole, a right which can only be lawfully obstructed in a portion of it, by public authority, that of the ecclesiastical magistrate, who gives occasionally an exclusive title in a part of the public cemetery to the succession of a single family, or to an individual who has a claim to such a distinction : but he does not do that without just consideration of its expediency, and a due attention to the objections of those who oppose such an alienation from the common use. Even a brick grave without such authority is an aggression upon the common freehold interest, and carries the pretensions of the dead to an extent that violates the just rights of the living.

"If this view of the matter be just, all contrivances that, whether intentionally or not, prolong the time of dissolution beyond the period at which common local usage has fixed it, are acts of injustice, unless compensated for in one way or other. In country parishes, where the population is small and the cemetries are large, it is a matter less worthy of consideration. More can be spared, and less is wanting. But in populous parishes, in large and crowded cities, the exclusive possession is unavoidably limited; for, unless limited, evils of formidable magnitude would take place. Church-yards cannot be made commensurate to a large and increasing population; the period of decay and dissolution does not arrive fast enough in the accustomed mode of depositing bodies in the earth, to evacuate the ground for the use of succeeding claimants. New cemetries are to be purchased at an enormous ex-

pense to the parish, and to be used at an increased expense to the families, and at the inconvenience of their being compelled to resort to very incommodious distances for attendance upon the offices of interment. Three additional burial grounds in this very parish have been so bought. This is the known progress of things in their ordinary course; and if to this is to be added the general introduction of a new mode of interment, which is to insure to the bodies a much longer possession, the evil will be intolerable. A comparatively small portion of the dead will shoulder out the living and their posterity. The whole environs of this metropolis must be surrounded by a circumvallation of church-yards, perpetually enlarging, by becoming themselves surcharged with bodies; if indeed landowners can be found willing to divert their ground from the beneficial uses of the living to the barren preservation of the dead, contrary to the humane maxim quoted by Tully from Plato's Republic, ' *Quæ terra fruges ferre, et, ut mater, cibos suppeditare, possit, eam nequis nobis minuat neve vivus neve mortuus.*'

" If, therefore, these iron coffins are to bring additional charges upon parishes, they ought to bring with them a proportionate compensation; upon all common principles of estimated value, one must pay for the longer lease which you actually take of the ground. And what is the exception to be pleaded for iron? If you wish to protect your deceased relative from the spoliators of the dead, by additional securities, which will press upon the convenience of the parish, we do not blame the purpose, nor reject the measure; but it is you, and not the parish, who must pay for that purpose. I am aware (as I have already hinted,) that very ancient canons forbid the taking of money for interment, upon the notion that consecrated grounds were among the *res sacra;* and that money payments for them were, therefore, acts of a demoniacal complexion. But this has not been the way of considering that matter since the Reformation, (for the practice certainly goes back at least as far;) it appears founded upon reasonable considerations, and is subjected to the proper control of an authority of inspection. To inland and populous parishes, where funerals are very frequent, the expense of keeping church-yards in an orderly and seemly condition is not small; and that of pur-

chasing new church-yards, when the old ones are likely to become surcharged, is extremely oppressive. To answer such charges, both certain and contingent, it is surely not unreasonable that the actual use should contribute when it is called for."

From this it will be perceived that, while the common cemetry *is* subject only to a temporary appropriation, yet there may be a grant of an exclusive title to a part of the public cemetry from the ecclesiastical authority. A faculty or grant from the bishop will authorize the erection of tombs and monuments. The person who sets them up has a right of action for injuring or defacing them during his life; and the heir of the deceased has a like right of action. The heir has a right of property in the monuments and escutcheons of his ancestors; and may bring an action against those who take or deface them: Coke Lit. 18, b.; Gibson's Codex, 544; Cro. Jac. 367. But the heir has no right of property in the bodies or ashes of his ancestor and can bring no civil action against those who may indecently violate and disturb their remains when buried: 2 Blackst. 429. And yet the property in the shroud and winding-sheet are in the executor or other person who was at the charge of the funeral; and a stealing of it will be felony: *Haynes's Case*, 12 Coke, 113; and see 2 R. S. 688.

Since, then, there may be a right of property acquired in monuments or tombs erected by a faculty or grant, why may not such a right be acquired by purchase from the corporation of a religious society?

A vault, in reference to interment, is but a place to entomb; and when so used, becomes a tomb; a receptacle for the dead —a last resting place. A grant of such a place gives an exclusive right; and why may it not be perpetual? Abraham's purchase of the cave in the field of Machpelah, " for a possession of a burying-place," was of that character. There, according to sacred history, the patriarch buried his wife Sarah, and was himself buried; there, were Isaac and Rebecca also laid; in that cave Jacob buried Leah, and while sojourning in Egypt and about to die, he made his son Joseph swear to him to remove his body and bury it with his fathers. Here

we have an instance of a purchase, which enured to the pur- 1837.
chaser and his heirs even to the fourth generation.

It is certainly competent for a man, at this day, to buy the
fee simple of an estate in land for the purposes of sepulture;
and when converted to that use, the title may descend or be
again the subject of sale.

IN THE MATTER
OF THE BRICK
PRESBYTERIAN
CHURCH.

The conveyance from the city corporation to the church, in the
year one thousand seven hundred and sixty-six, was a convey-
ance of the fee of the land, a base or determinable fee, being
subject to a quit rent and to a condition that the land should
be appropriated to a particular purpose—that of a church and
cemetry. This renders it a conveyance to a pious and chari-
table use; but it was still a conveyance of the land and con-
ferred on the grantees an estate and interest in land for the
purposes intended. In appropriating this land to such intend-
ed purposes, it was competent for the trustees to dispose
of it as they might think proper not inconsistent with the
grant and the use for which they expressly held it, namely,
on a part of the ground to erect a church edifice; in another
part to construct vaults for public use, reserving a space for
graves to be opened, on such terms as they might think pro-
per to prescribe; and the residue to lay out for private vaults
and to sell the sites or ground for that purpose. And such
sales might be of the fee of the land;—true, only a base fee,
such as had been conveyed to them. The trustees proceeded
to dispose of lots or parcels of the land within the conditions
on which they had received the property, as we have seen by
their resolutions passed in the years 1769, 1786 and 1788.
The intention obviously was, to sell and dispose of *the land;*
and not to grant a mere temporary use or privilege to construct
vaults in the land with a reserve of the title to the church. It
was a grant of the land itself, such as passed the title to the
purchasers or lessees. And hence the form of the convey-
ances, describing each lot or parcel by metes and bounds,
with all the apt words generally used to pass the title to the
land; still, the use and enjoyment is limited to that which is
below the surface—there is to be no building above ground.
A good reason, of course, exists for this. And yet, such a
limited use is not inconsistent with a grant of the soil. A man
who has a title to lands in fee simple, may build his house

beneath as well as above the surface. I cannot but conclude that the deed and the lease in question confer title to the land and not a mere easement or privilege to inter the dead.

If I am correct in this, it can make no difference that any further interments are now prohibited within these vaults, and certainly no argument drawn from this circumstance can give the petitioners any right to resume the control of the vaults, to break them up or desecrate the ground. The corporation ordinance, which restricts burials in our city, may have been intended as a prohibition, but the practical effect, as we know, has not been such. The fine imposed, of two hundred and fifty dollars, has rather operated as a tax upon this privilege than as a prevention. Many vault holders have continued to use their family resting places by paying this penalty; and the very objectors on the present occasion may desire to do so.

This view of the case renders it unnecessary to examine into the expediency or propriety of the proposed sale and removal of the church. If the petitioners have not the right without obtaining the consent of the vault-holders, then it cannot be done, however much it may be desired by a large portion of the congregation.

Even if I should be mistaken as to the right of the vault-holders and it could appear that the petitioners can lawfully sell and raze the foundations of the church and destroy these resting places of the dead, still the necessity and expediency of the step, when coupled with the interest and welfare of the church and its congregation, are not so apparent. Great difference of opinion exists among the members and congregation on the subject. The elders, deacons and trustees are divided; and although a majority of them are in favor of a sale and removal, yet a majority of the congregation at large appears to be against it. There is great danger that a removal may be attended by a dispersion and scattering of the flock; but, leave the old hallowed church in its conspicuous and commanding situation and it will always be attractive. Something is due to its venerated walls. Many of those revered and good men, whose names are on its earliest records, are entombed within its precincts. Their ashes have mingled with the earth, and have helped to consecrate the spot. Let it

stand as a valued monument, sacred to religion and to the memory of its founders, until, indeed, it can be no longer useful.

I must dismiss this petition.