RICHARDS *a.* THE NORTHWEST DUTCH CHURCH.

*Supreme Court, First District; Special Term, April,* 1854.

INJUNCTION.—RELIGIOUS CORPORATION.—CHURCHYARD BURIAL VAULTS.

The rights of owners of burial vaults in churchyards in cities, in respect to resisting a sale of the premises by the church.

Motion to continue a temporary injunction; and trial by the court.

This was an action brought by the plaintiff in his own right, and as a trustee of Sarah Huyler and Maria E. Richards, against The Northwest Protestant Reformed Dutch Church in the city of New York, to restrain them from removing from the plaintiff's vaults in the churchyard, the remains of deceased persons

reposing there, to compel them to restore such remains if they had been removed, and for damages.

A similar action brought by Henry A. Bogert against the same defendants was brought on at the same time.

The complaint in the first action set up a claim to a vault in the grounds of this church on Franklin-street under the following deed, of the minister, elders, and deacons of the church:

The parties of the first part "for and in consideration of the sum of Two hundred dollars, current of the United States of America, to them in hand paid by the party of the second part, at or before the ensealing and delivery of these presents, the receipt whereof is hereby acknowledged, have granted, bargained, sold, and conveyed, and by these presents do grant, bargain, sell, and convey unto the said party of the second part, and to his heirs and assigns forever, all that certain lot or piece of ground situated, lying, and being in. the churchyard above said, distinguished and known, beginning on the northwest corner of the ground belonging to the New York Sugar Refining Company on Franklin-street, thence running westerly along Franklin-street twenty feet, thence southerly to the northeasterly corner of the church and along the church twenty feet, thence easterly twenty feet to the line of the said Sugar-house Company, thence along the line of the said Sugar-house Company to the place of beginning, the whole of it to be twenty feet square. To have and to hold all the said lot of ground with the appurtenances unto the said party of the second part, his heirs and assigns, to their only proper use and behoof of the said party of the said second part, his heirs and assigns forever; provided always, and these presents are upon these conditions nevertheless, that the lot of ground shall never be used, occupied, or appropriated by the said party of the second part, his heirs or assigns, for any other use or purpose than to inter such dead bodies in graves or in vaults as the party of the second part, his heirs and assigns, shall from time to time think proper. And, further, the parties of the first agree with the party of the second part that they shall never suffer it to be dug up or destroyed; but that it shall be the duty of the parties of the first part, and their successors in office, to keep it harmless and never to appropriate it to any other use than to deposit the

dead as aforesaid, without the consent of the party of the second part.

"In witness," &c.

The complaint set up that the church officers had agreed to sell the church property, including the above vault, and had already removed some of the remains of the plaintiffs' relatives from the vault against the consent of the plaintiffs, and without their knowledge, and were about to remove all the residue.

The only difference in the facts in the second case, appears in the opinion.

MITCHELL, J.—Motion for continuance of a temporary injunction to prevent the defendants from destroying a vault or interfering with the heirs of Sarah Huyler, and the plaintiffs in the second suit, in the use of the vault.

The vault is in part of the church ground of the Dutch Church in Franklin-street. The church was incorporated in 1808, but the legal title to the land remained in trustees until 1832, when by a decree of the Court of Chancery the trustees conveyed to the church.

In the mean time the church must have acted as the owner of the land, and in 1817, it conveyed by deed to Westervelt and his heirs forever the land on which the vault is erected, with a proviso that it should be used by him and his heirs only as a burial place for such persons as he and his heirs should choose; and the church covenanted that it would never suffer that ground to be used for any other purpose than a burial ground, and that it would not suffer it to be dug up or destroyed.

Westervelt, by his will directed that none but his near relations, and Mrs. Sarah Huyler and her daughter, Eve A. J. Huyler, should be deposited in the vault.

Eve, the daughter, died in 1840, leaving a son and a daughter; this daughter married Mr. Richards, one of the plaintiffs, and died leaving him and a daughter, Maria E., the other plaintiff in the first suit, surviving. Mrs. Huyler died in 1843, having first made her will, and thereby appointed Mr. Richards her executor.

The plaintiffs in the second suit are some of the heirs at law of Westervelt, the grantee of the vault.

Some of the heirs of Westervelt, or some one claiming under them, instituted a suit in partition as to this vault, making (so far as appears) all proper persons parties, unless the plaintiffs in the first suit were necessary parties, and obtained a judgment for a sale of the vault, and it was sold accordingly, and bought by or for the church.

The church then in 1853, applied to this court and obtained an order for the sale of the whole church ground, no exception being made of the vault, and no notice given to the plaintiffs in either of these suits.

Before these actions were commenced, the authorities of the church caused the bodies in all the vaults attached to the church to be carefully removed and deposited in other grounds, the bodies in this vault being deposited in Greenwood, and, it is understood, with proper means of distinguishing the burial spot of each body.

The church was incorporated after the passage of the law prohibiting religious societies from transferring the absolute title to their estate without the sanction of the chancellor; no such sanction was obtained for the grant to Mr. Westervelt. It would be unnecessary if the grant must be understood as from its nature to continue only so long as the church should continue to occupy the ground for religious purposes, or to own the land, or subject to the right of the church to convey absolutely on obtaining the sanction of the chancellor.

These limitations, or some of them, are implied in the grant of a pew, although the form of the grant be absolute and unconditional.

There are reasons why the same limitations might be held applicable to a grant of ground for a vault in a city, especially one like this.

It must have been known when the grant was made, and then entered into the consideration of both parties, that from the regular growth of the city, places then dedicated to religious worship would become unsuitable for that purpose in the course of years, by the congregation moving further up town and deserting the old location, and these places becoming fitted only for business purposes, and much more valuable on that account.

Those who had at heart the cause of religion could not have intended to give or take any grant which would prevent the church to which they were attached, from conforming to these necessary changes; to do which the church must sell all its grounds for business purposes, and invest the proceeds in other lands, and a new house of worship accessible to the worshippers, and in other burial grounds which would continue to be devoted for the burial of the dead.

He, whose religious sympathies led him to select the grounds attached to the church of his faith for the deposit of his dead, and of his own mortal body, must have done so not because he had a special attachment to this spot of land after it should be surrounded by houses where nothing should be spoken of or thought of but the means of increasing this world's wealth; but because it was part of the grounds consecrated to the Almighty, and from which the thoughts of earthly gains should be banished.

His choice and his command would have been as Joseph's was when he "took an oath of the children of Israel saying, God will surely visit you, and ye shall carry up my bones from hence."

The feeling of the Christian who selects consecrated ground for his burial, is that his body may be wherever his church may be, or wherever that church may continue to deposit its dead; and not that it should remain in a place that had become desecrated from changes necessarily occurring.

"Where thou diest, will I die, and there will I be buried;" shows the desire that neither death nor the changes of the world should separate, even after death, those who were united in life.

In this case the occupation of the ground for its original purposes is necessarily abandoned. How, then, will the defendants best fulfil their trust to the grantee? By leaving his vault the only consecrated ground, while all around it is devoted to gain? or by transferring the remains of those dear to him to other grounds, where their ashes will mingle with the ashes of others of the same faith?

There is some reason, therefore, for implying a limitation of a grant for a vault, although it be absolute in its form, and that

that limitation was within the intention of the parties (when the ordinary course of events is considered), and so is to be read as bearing on the face of the grant as though the limitation formed part of the grant.

It may be that this is not so clear that the plaintiffs should not have the injunction continued to the hearing, if the remains of their connections were still in the vault.

But as those remains had been removed before this suit was brought, and have been previously cared for, the only important question remaining now is, who has the legal title to the ground, and whether the defendants should compensate or not the plaintiffs for injury already done, or secure to them equally valuable ground in another place?

All those questions should be reserved to the hearing.

There are also other questions to be passed upon,—as, whether the plaintiffs' right is not cut off by the sale in partition; or whether the ownership of a vault is of such a character that it was never intended to be partitioned, and so not to be sold in a suit for partition? What relations of the deceased, or what persons connected with them, or with the original grantee of the vault, may have a right to stay a sale of the ground on which the vault is placed; and whether any of these plaintiffs stand in that relation to the grantee?

These questions place the plaintiffs' claim in such doubt that, under the circumstances now existing, the injunction should not be continued.

It is accordingly dissolved so far as granted, and the motion for its continuance denied. Ten dollars costs, to abide the event.

On a trial of these actions before the court, the following opinions were rendered:

Roosevelt, J.—The plaintiffs claim to be vault-owners in the churchyard of the Dutch Church in Franklin-street, lately sold under an order of the court.

They demand that the defendants be compelled to replace the bodies which have been removed to Greenwood; to restore the vault to its original state, and to refrain, under pain of commitment, from any further interference with their rights.

The character and legal attributes of burial property, as distinguished from ordinary absolute ownership in fee, are not perfectly clear. In the present case a preliminary injunction was at first granted by one of the judges; but on a further although not final hearing by the same judge, was dissolved.

The remains of the deceased relations had already been removed, and removed, I must say, to a much more suitable if less legal resting-place, than the heartless bowels of a noisy, bustling, money-making city. Nothing is left, therefore, now that all the pleadings and proofs are before the court, but to determine the mere dry legal rights of the parties.

Were it otherwise, however, and could the dead without rising speak; a voice, it seems to me (in the apt quotation of Mr. Justice Mitchell), would assuredly be heard, saying: "Ye shall carry up my bones from hence."

Franklin-street, between Church-street and West Broadway, has lost every attribute of repose. Its unfitness for a cemetery, if spiritual bodies can see and feel, must be as palpable to the dead, as to the living; still the plaintiffs insist that there shall be no removal, and that, as matter of legal right, without their consent there can be none.

In 1817, the corporation of the church, it appears without any previous order of the chancellor, conveyed a small piece of ground in the churchyard, adjoining the church edifice, to the grantee, "his heirs and assigns forever," to be used, in the language of the instrument, for the purpose of a burial place, and for no other purpose whatever.

In this plat, the grantee soon after his purchase, constructed a vault, which became the depository from time to time of his own remains and those of deceased relatives, till the year 1852; when, on the petition of the corporation of the church, an order was made by this court authorizing a sale of the church edifice, and of the whole church premises, including the ground in question.

A sale was accordingly made, and on report of its terms and conditions, was duly confirmed, and the bodies thereupon, with the approbation of a large majority of the relatives, decorously removed to a suitable burial-place, purchased for the purpose, in the cemetery at Greenwood.

Did sale, then, thus authorized and confirmed, divest the title

of the representatives of the grantee in the vault which their ancestor had purchased?

The right of burial, it seems to me, when confined to a church-yard, as distinguished from a separate, independent cemetery, although conveyed with the common formula of "heirs and assigns forever," must stand upon the same footing as the right of public worship in a particular pew of the consecrated edifice.

It is an easement in, and not a title to, the freehold—and must be understood as granted, and taken, subject (with compensation of course) to such changes as the altered circumstances of the congregation or the neighborhood may render necessary.

The selection of a place of burial, in the ground forming the site of a church, we may safely say, is always made with reference to its religious associations, and with an eye to their continuance.

Suppose the edifice to be destroyed by fire without the means of rebuilding—an event not entirely improbable or unprecedented, must the premises continue an unsightly ruin with no power anywhere to meet the emergency?

Or must we not rather, from the nature of the contract, and from the character of the subject of its provisions, infer a silent understanding between the parties (quite as operative as if expressed in words at length), that in such case the corporation of the church—in other words, the representative body of whom the pew-owners, vault-owners, and other members of the particular religious association may be said to be the constituents—should sell the real estate which had become unfit for its original object, and "with the consent and approbation of the chancellor, apply the moneys arising therefrom to such uses as they should conceive to be most for the interest of the society to whom the real estate so sold belonged."

Every deed of conveyance, whether for a pew, or a vault, or a house, is a contract between the parties, to be interpreted according to their actual or fairly to be presumed intent.

The statute, to prevent all doubt on this point, makes it in terms the "duty" of all courts of justice, "in the construction of every instrument creating or conveying any interest in land" to carry into effect "the intent of the parties." (1 *Rev. Stat.,* 748.)

This intent—the statute further provides—shall be "collected from the whole instrument," and of course from its scope, object, and subject-matter, and not from the mere letter of a particular sentence.

Although, therefore, the deed in question purports to convey a certain specific piece of ground, twenty feet by twenty, we must bear in mind that it describes the premises as belonging to a church corporation, as adjacent to a church edifice, as in a churchyard, and to be used exclusively as a place of interment, and subject to church assessments for regulation and repair.

In this view, both parties, it seems to me, the one in executing, the other in accepting the conveyance, must have considered it as the grant of a mere easement, and not of an ordinary absolute estate in fee.

And hence no order of the chancellor was applied for, and in that view, none was required—although such order, in all cases of church property is indispensable to an absolute conveyance of the soil.

Like the sale of a church pew, which gives the mere right to worship in the particular place while the church stands, and is occupied for religious purposes, the sale of a church vault gives, it would seem, the mere right of interment in the particular plot of ground, so long as that and the contiguous ground continues to be occupied as a churchyard. The owner of the easement may be, in case of disturbance, and no doubt is, entitled to a reasonable compensation or equivalent; but he cannot interpose a veto to the disposition of the soil, should the court, as was actually the case in this instance, on application of the legitimate church officers, deem such disposition proper, and order it accordingly.

Every person purchasing either a pew in a church edifice, or a grave in a churchyard, appendant to a church, does so with the full knowledge and implied understanding that change of circumstances may, in time require change of location, and that the law (a positive statute which has been in existence nearly half a century), looking to such exigency, authorizes the corporation, when it arrives, as the representative of all interests, with the sanction of the court, to sell the soil in absolute fee, discharged of all easements, and to make some other more appropriate investment or disposition of the proceeds.

Counsel have cited several authorities in support of their respective positions. Those relating to the pew-rights are uniform. They all concede that such rights, however strongly conveyed, are devested by a regular sale of the church edifice.

Those relating to vault-rights are discordant, and neutralize each other. Vice-chancellor McCoun, in the Brick Church case, held one way, and Mr. Justice Edwards in that of another church, held the opposite. (See 3 *Edw.*, 155 ; and 8 *Barb.*, 130.)

The reasoning, which leads to the result arrived at in the case of church pews, is applicable, as it seems to me, in a great degree to the case of church vaults. It proceeds upon the assumption—a necessary assumption—that church grants in such cases are made upon the implied condition, that the land shall be subject to the right of what may be called eminent domain—that is, subject to the right of resumption whenever the public use, or a change of circumstances may, in the judgment of the church and of the court, require the exercise of such right; but subject also to the duty of making a just and fair compensation, in the form of money or other suitable equivalent, if required.

As the complaint in this case only calls in question the validity of the sale, and is not adapted to a claim for compensation, it must be dismissed with costs.

### BOGERT *a.* THE NORTHWEST PROTESTANT REFORMED DUTCH CHURCH.

This case presents the same questions as that of Richards and others, with the additional one that a decree of sale in a partition suit, in which all the owners of the vault, including the plaintiffs, were parties, was made by consent, and a title conveyed, under or through it, to the defendants or their grantees.

Now, although an easement, such as the right of burial, may not be a proper subject of partition, and although the proceeding might, on that ground, have been demurred to, yet no objection at the proper time having been taken, and an express consent, even, having been given, the sale so made by decree, must have the same effect as if made by direct conveyance, executed by all the parties to the partition suit.

Bill dismissed, with costs.