In the matter of the petition of the MINISTER, ELDERS AND DEACONS OF THE REFORMED DUTCH CHURCH IN SAUGERTIES.

Though pews in .a church be held under an absolute conveyance, the holders thereof have no legal interest in the church edifice.

A church corporation has power to regulate and order the renting of the pews; but it can no more sell a pew, absolutely, without an order of the court for that purpose, than it can sell the house itself, without leave.

Pew-holders have only the right to occupy their pews for the purposes of worship. The title to the freehold still remains in the corporation; and the pew-holder cannot compel it to maintain divine service, or even to open the house for that purpose.

The supreme court, as the successor of the court of chancery, can only ratify or veto a sale made by a religious corporation, of its property. It has no power to direct or require the corporation to sell, against its will, or to control it in the disposition of its property.

The court may, for sufficient reasons, withhold its assent to a sale, and thus compel the corporation to retain the property; but this is the extent of its power.

In case of a sale of the property of a religious corporation, with the assent of the court, the avails are not to be distributed among the original contributors and pew-holders; but they are to be applied to such uses as *the corporation*, with the consent and approbation of the court, shall conceive to be most for the interest of the society.

The authority of the court is entirely *negative*. It may withhold its assent, and thus prevent the application of the proceeds in any specified manner, but it cannot direct the corporation how to apply the moneys.

It is the right of a church corporation to designate the object for which the moneys arising from the sale of its real estate shall be used. If the object thus designated meets the approval of the court, the appropriation will be made. If not, the money must be retained by the corporation until it can make such an application of it as will secure the consent and approbation of the court.

THE petitioners stated in their petition that they were incorporated in 1826, pursuant to the act to provide for the incorporation of religious societies; that two several lots of ground were conveyed to the corporation about the same time, upon which they erected a house of worship, which they continued to occupy up to the time of presenting the petition; that, in 1841, the corporation purchased another lot, and erected thereon a lecture room for the use of their congregation. The petition fur-

ther stated, that in pursuance of a resolution adopted at a meeting of the male members of the church and congregation, held on the 7th of May, 1850, the consistory of the church proceeded to take measures for the erection of a new church edifice; that a lot was selected for the site, and a plan of the building procured, and these submitted to a meeting of the congregation, on the 11th of December, 1850, and approved and adopted; that in January following a contract was entered into for the building of the house. The petition further stated, that the building was progressing, about $7000 having been expended thereon; that when completed, the new church edifice would meet the wants and necessities of the congregation, and materially advance the interests of the church. That the location was more eligible, and the house more convenient, and of better structure, and larger size, than the old edifice; that two churches of the same denomination were not required in the village, and could not be maintained without serious injury to both; that, by the terms of the building contract, the new edifice would be completed on the 1st of May, 1852, and that the corporation would require as much as the old church and lecture room and the lots upon which they were situated would produce, upon a sale thereof, to complete and furnish their new edifice. It was further stated, that at a meeting of the consistory held in December, 1851, it was resolved that application should be made for authority to sell the old church edifice, and also the lecture room and the lots upon which they were severally situated. The prayer of the petition was for such authority, and that the avails of the sale might be applied to the completion of the new church edifice and the fixtures and furniture thereof. The petition was verified by the oaths of six members of the consistory; the three remaining members having refused to unite in the application. It was presented to the court, at a special term held at Albany in January, 1852. The minority of the consistory, and several pew-holders and other members of the congregation, appeared, by counsel, and opposed the application. An order was thereupon made, by consent of the counsel for the parties respectively, directing a reference to take such proofs as the parties respect-

ively might produce, in reference to the controversy. The parties appeared before the referee from time to time, and numerous witnesses were examined. The application was again brought to a hearing upon the petition, and the proofs which had been taken, at the February special term, 1853.

*H. Hogeboom* and *H. D. Van Orden*, for the petitioners.

*K. Miller* and *E. Whitaker*, for the remonstrants.

HARRIS, J. The order of reference, though made at my suggestion, has proved an unhappy measure. It has served to keep alive the controversy for a year, subjecting the parties to great and needless expense, and has really elicited but few facts having any important bearing upon the merits of the application.

The project of erecting a new church, seems to have been agitated in the early part of the year 1850. The meeting of the congregation, when it was resolved to go forward with the enterprise, was held on the 7th of May, that year. At that meeting, Edwin Myer, who claimed, by inheritance, a share in two or three pews in the church, but who, with his family, attended another church in the same town, and was not a contributor to the expenses of the Saugerties church, inquired of the minister, who was then presiding, what would be done with the old church. The reply, according to the testimony of Mr. Van Santvoord himself, was, that the old church would not be disturbed; that they proposed to build upon a new site. Mr. Myer and some other witnesses state, that he also added, "You shall not be defrauded out of your rights." The inquiry was made, and the answer given, while the proposition to build a new house was pending. It does not appear that the manner of disposing of the old church was the subject of discussion at that meeting or any other, or that any thing more was said by any of the parties interested in the question.

It is now insisted by the counsel for the remonstrants that they relied upon the answer given by the presiding officer to Mr. Myer as an assurance that, in case a new edifice should be

built, the old church would be left to those who might not choose to unite in the new enterprise. I cannot suppose that any such thing was intended. There is nothing in Mr. Van Santvoord's reply, as it is stated by any of the witnesses, which justifies such an inference. When asked what was to be done with the old church, the natural reply was, that it was not to be disturbed, or as others say, it was not to be touched. He added also, that Mr. Myer, whose only interest in the matter was the shares he held in some pews, should not be defrauded. There is certainly nothing in all this, which warranted any person in supposing that it was the purpose of the corporation to abandon its property to those who did not unite in building the new church. The fair import of what was said is, that it was intended, if they built at all, to build upon a new site, and so it would be unnecessary to disturb the old edifice. What disposition should be made of it, would remain for future decision. But, at any rate, that Mr. Myer, who had no other concern in the matter, should not be defrauded. I can scarcely believe that, if these remonstrants had expected or intended that the old building should be left for their use and enjoyment, they would have suffered the matter to pass without, at least, an expression of the meeting to that effect. They could not but have known that Mr. Van Santvoord, even if he had intended any such thing, had no authority to speak for others upon the question, and had no power to commit the corporation to any such arrangement. The old church and lecture room, and the lots upon which they are erected, are the property of the petitioners. The title is vested in the corporation. It is not in the power of the remonstrants, not even with the aid of the court, to divest that title. Of what avail then would it be to them, could they succeed in defeating this application? They could not thereby secure the benefit of the property to themselves. It would yet remain quite as much beyond their reach as if it were sold to a stranger. The corporation, as the legal owner, would still have the exclusive control of the property. If the consistory, acting as the trustees of the corporation, should see fit to close the church, or the lecture room, who would have the right to open them? If they

should let them to tenants, the remonstrants could not gainsay their legal right to do so. Why then resist the sale? What advantage can the remonstrants expect from compelling the petitioners to retain their property?

If, as appears from the papers before me, the pews claimed by the remonstrants are held under an absolute conveyance, they have, in fact, no legal interest whatever in the old church. The corporation had power " to regulate and order the renting of the pews," but it could no more sell a pew, absolutely, without an order of the court for that purpose, than it can now sell the property in question without such an order. ( *Voorhees* v. *The Presbyterian Church of Amsterdam*, 8 *Barb.* 135.) But assuming that the remonstrants, or some of them, have valid leases of their pews, their title only confers upon them the right to occupy the pews, for the purposes of worship. The title to the freehold still remains in the corporation. The pew-holder cannot compel it to maintain divine service, or even to open the house for that purpose. " No intimation can be found," said Wilde, J. in *Fassett* v. *The First Parish in Boylston*, (19 *Pick.* 361,) " that a parish or religious society would subject themselves to any liability to the pew-holders, in consequence of abandoning their meeting house as a place of worship, although the pews may thereby be rendered useless." In that case, as here, the defendants had erected a new house, and left the old meeting house standing. It was held to be a case of *damnum absque injuria.*

At the common law any corporation aggregate had unlimited power over its property. There was no restraint upon its right to alienate. But, by the act for the incorporation of religious societies, (3 *R. S.* 244, § 11,) such alienation can only be made upon an order of the chancellor. It was deemed necessary, for the protection of those who are the real owners of such property, to require the sanction of that officer, before the corporation could make a valid conveyance. But the chancellor could only *ratify* or *veto* the sale. He had no power to direct or require the corporation to sell against its own will. This court, therefore, being now vested with the power of the chancellor, has no right to

control the petitioners in the disposition of their property. It may, for sufficient reasons, withhold its assent to a sale, and thus compel the corporation to retain the property. This is the extent of its power.

Are there reasons, in this case, for withholding this assent? Should the petitioners be required to retain the property in question? Should this be done, what advantage can the remonstrants hope to derive from thus defeating the wishes of the consistory? We have seen that the absolute control of the property will remain in the hands of the consistory. How, then, can those who wish to occupy the old church, as a house of worship, expect to secure their object by compelling the corporation to keep the property? The mere suggestion of these inquiries, it seems to me, is sufficient to show, that the remonstrants themselves can gain nothing by preventing a sale.

But the remonstrants insist that, in case the property must be sold, a distribution of the avails shall be made among the original contributors and the pew-holders, according to their respective interests. Here, again, the court is powerless. In case of a sale, the proceeds are to be applied to such uses as *the corporation*, with the consent and approbation of the court, shall conceive to be most for the interest of the society. The authority of the court is entirely *negative*. It may withhold its assent, and thus prevent the application of the proceeds in any specified manner, but it cannot direct the corporation how to apply the moneys. It is the right of the corporation to designate the object for which the moneys arising from the sale of its real estate shall be used. If the object thus designated, meet the approval of the court, the appropriation will be made. If not, the money must be retained by the corporation until it can make such an application of it as will secure the consent and approbation of the court. An order, therefore, directing the distribution of the proceeds of the property to be sold, in the manner proposed by the remonstrants, could not be made without the concurrence of the corporation. Such concurrence the remonstrants would scarcely expect to obtain.

There is, therefore, no alternative but to deny the application

for leave to sell, and thus compel the corporation to keep the old church and lecture room, though now useless and unproductive; or, to make the order for a sale, and consent that the moneys be appropriated in the manner indicated in the petition. For the reasons already stated, I cannot hesitate to adopt the latter alternative. An order must be made, therefore, in accordance with the prayer of the petition.

Having thus disposed of the questions presented for adjudication, I may, perhaps, be indulged in a suggestion or two for the consideration of the parties to this unhappy controversy. The remonstrants, though numerous and comprising some of the most respectable men in the church and society, are yet a minority. It is the right of a majority to control, in all civil affairs, and not less in the management of the temporalities of a religious society than any other. This is a cardinal principle in our free institutions. It pervades the whole structure of society. Where men differ in opinion, the will of the majority must prevail. The rule is safe and equitable. Sometimes, though not often, the application of the rule results in individual hardship. Sometimes, too, though very rarely, it is necessary to protect the rights of a minority against the arbitrary acts of a majority. But, generally, when individuals unite their interests to accomplish a common end, they should expect and be willing, that a majority of the associates should govern, in all matters of common interest. They may be supposed to enter the society with the knowledge that they are to be governed by this principle.

On the other hand, those who prevail in this controversy should not forget that the minority, as well as themselves, have their rights. These rights should be tenderly regarded; and the more so, because they *are* the rights of a minority. It is quite evident, I think, that the parties are not likely, successfully, to maintain two distinct organizations. The views of the committee appointed by the classis, upon this point, are forcible and eloquent. Under these circumstances, sound policy, as well as the more exalted principles by which all the parties profess to be actuated, requires that the most enlarged forbearance should be habitually exercised, and the most liberal concessions made,

towards those who have hitherto opposed the action of the majority. The disease, it is true, seems to have become chronic, and is, perhaps, incurable; yet it may be, that these specifics, faithfully applied, will operate with healing efficacy.

[ALBANY SPECIAL TERM, February 22, 1853. *Harris,* Justice.]