WYATT and others *vs.* BENSON and others. ·

23b 327
57ad257

The supreme court having, since the constitution of 1846 was adopted, succeeded to all the powers and authority formerly vested in the chancellor, an application for leave to sell the real estate of a religious corporation must now be made to the supreme court. (*See note a.*)

Such an application can only be made by the *corporation;* and the court has no power to grant an order of sale, except upon the petition of the corporation.

Even the legally elected trustees of a religious society have no right or power to institute or carry on proceedings to sell the real estate of the society, without the consent of a majority of the corporation.

The corporation consists of every member of the congregation having the privilege of voting ; and it was the intention of the legislature to place the control of the temporal affairs of religious societies in the hands of the majority of the corporators.

Where an order of the court, giving its consent to a sale of a church edifice, has been made, on the petition of a majority of the board of trustees of the society, but such petition was not authorized or sanctioned by a majority of the corporators, the order, if still *in fieri,* and not executed, no rights having been acquired under it, is under the control of the court; and it is competent for the court to revoke its consent to the sale.

And it is the *duty* of the court to withdraw its consent, when it is apparent that the sale of the property would be in opposition to the views of a large majority of the corporators.

A religious corporation, not having the power to sell its real estate without the consent of the supreme court, cannot submit the question of sale to any other tribunal ; and if an arbitrator is chosen, and he decides that the property shall be sold, his award is not binding upon any one, and gives no authority to make the sale.

The making of such an award, and its confirmation by an order of the court, will present no obstacle to the granting of relief, by injunction to stay the sale, where it is shown that a majority of the corporators are opposed to the sale.

Neither will corporators be bound by the submission to an arbitrator, of the question who are the legally elected trustees of the corporation.

A submission and award in reference to that question cannot legally determine who are the duly and lawfully elected trustees, and will not prevent a portion of the corporators from calling in question the right of those claiming to be trustees, to act as such.

THE complaint in this cause was filed by 27 plaintiffs, on their own behalf and that of other members of the congregation and society of the First Methodist Episcopal Church in the city of New York, against the defendants, who claim to be the trustees of the said church. The object of the action was

to restrain the trustees from taking any further proceedings for a sale of the church in John street, belonging to said society. The complaint set forth that the said society were the owners of a valuable piece of ground in John street, upon which it erected a church, and which has been long used by said society as a place of religious worship. The complaint set out the names of 74 persons including the plaintiffs, who were the only members and corporators of the said society. It also set forth the proceedings instituted in this court, by the said trustees, to obtain its consent to a sale of the said real estate of the society, and the proceedings of those opposed to such sale. That on the 15th of June, 1856, 19 of the members of said society, including 8 of those who claimed to be trustees thereof, removed from said church in John street and organized a new church with the same name, in the Fourth avenue, near Madison square. That at a meeting of the trustees of said society held on the 12th of February, 1855, it was resolved that steps be taken, to remove said church and society up town, and on the 9th of April, 1855, the trustees of said society resolved that *in their judgment,* it was expedient and proper to make sale of the church property in John street as speedily as possible and to erect new church buildings in or near Madison square, and for that purpose an application was directed to be made to this court, for its consent to a sale of the said John street property. These proceedings of the board were supported by six trustees and opposed by three. That at that time only 16 members of said society were in favor of said sale and that 60 were opposed to it. That one of said trustees caused a paper to be prepared, to be presented to this court, for a sale of said property, and which was signed by 25 persons who claimed to be members of said society. That on the 2d day of April, 1855, a meeting of the members and corporators of said church and society was held, who passed resolutions in opposition to said sale. That on the 10th of May, 1855, on the application of said trustees, an order was made by this court consenting to a sale of the said church property. That soon thereafter a suit was instituted in this court, by James T. Barnes and several other members of said

Wyatt v. Benson.

society (none of the present plaintiffs being parties thereto) to restrain the sale of the said church and property. That on the 17th of September, 1855, a stipulation was entered into between the parties to these suits, to refer to the arbitrament of Bishop Simpson, the question of the sale and removal of the said church, and also the question of who were the legally elected trustees of the said church, and it was agreed that his award should be binding and final upon all the parties thereto, and upon all matters in controversy. It was agreed by the parties to such stipulation that Bishop Simpson's award should be a bar to all actions, litigations and proceedings of every kind and character, in that or any other action or complaint whatever, concerning the sale or removal of said church. Bishop Simpson did make his award on the 14th of December, 1855, but the same not being satisfactory to the parties, an order was made by this court in the said matter, resubmitting the whole subject to Bishop Simpson. That the parties opposed to the sale of said church, on the 9th of April, 1856, revoked their consent to said arbitration, and Bishop Simpson proceeded and made a new award. In this new award it was declared that the order of this court assenting to the sale of said church was a valid order, and should be carried into effect. That certain persons therein named were duly and legally elected the trustees of the said corporation. That the injunction granted restraining the sale of said church should be vacated. Thereupon an order was made in this court, on the 28th of April, 1856, confirming said award, and from that order an appeal was taken to the general term of this court, which is now pending. That in June, 1856, an action was commenced by the defendants, claiming to be the trustees of the said church, to obtain the possession thereof, and an injunction was thereupon issued, restraining the persons therein named as defendants from resisting the occupation of the premises by the plaintiffs. That several other suits have been instituted by various parties, in reference to said church, and the proceedings of the persons claiming to be trustees, and in favor of the sale and removal of said church, to obtain possession thereof. The plaintiffs further stated that they, and a large majority of the

members and corporators of said society, were opposed to said sale and removal; that the trustees elected at said church, which they alleged was the only legal place of election, were opposed to said sale and removal, and that none of the present plaintiffs were parties to any of said actions or proceedings, or to said submissions made to Bishop Simpson; and that they are not bound thereby. That this action was prosecuted in behalf of all the members and corporators of said church and society opposed to said sale and removal. They prayed that the action of this court consenting to said sale, may be annuled and revoked, and that the persons claiming to act as such trustees of said society, and in favor of said sale and removal, be restrained from taking any further proceedings for that purpose. The complaint also prayed that the persons who had been elected trustees by the opponents of said sale and removal, might be declared to be the duly elected and legal trustees of said society and corporation, and that the others claiming to be such trustees should deliver over and transfer to them all the corporate funds and securities now in their hands.

To this complaint the defendants put in an answer denying many of the allegations of the complaint. In support of them a large number of affidavits were read, from which it was clearly apparent, that a large majority of the corporators and members of said church and congregation are and have been since the first institution of the proceedings for that purpose, opposed to the sale and removal of the said church. The answer of the defendants was sworn to by them, and no affidavits were presented by or on behalf of any of the other persons claiming to be corporators or members of said church or society.

*P. Y. Cutler* and *L. S. Chatfield*, for the motion.

*E. L. Fancher* and *J. W. Edmonds*, in opposition.

DAVIES, J. The First Methodist Episcopal Church of the city of New York is a religious corporation, incorporated under the general act of the legislature of this state providing for the incorporation of religious societies. It would appear from the

Wyatt v. Benson.

12th section of the act of March 27, 1801, that it had been incorporated previous to that date, as that section authorizes the said corporation to continue to elect nine trustees of the said corporation, in the same manner as if that number of trustees had been originally named in the certificate of incorporation. (*Vol.* 1, *K. & R. p.* 343.) Section 3, of the act authorizing the incorporation of religious societies, provides that the male persons of full age belonging to any church, congregation, or religious society, may meet at the place where they statedly attend for divine worship, and elect not more than nine trustees, *to take charge of the estate and property belonging thereto,* and to transact all affairs relative to the temporalities thereof. After the first election of trustees no person is entitled to vote at subsequent elections, unless he shall have been a stated attendant on divine worship in the said church, congregation or society, at least one year before such election, and shall have contributed to the support of the said church, society or congregation, according to the usages and customs thereof. The powers of the trustees are particularly defined in section 4 of this act, and the only property of the society which they are authorized to dispose of is " All the moneys belonging thereto." Incorporated religious societies are aggregate corporations, and whatever property they acquire, whether it be real or personal, is vested in interest in the body corporate, and while the officers have it under their control or dominion, whatever possession they have is the possession of the artificial person, whose agents they are: they have no other possession than the directors of a bank have of a banking house. They are but the officers and agents of a corporation, who is the proprietor. (*Per Denio, J., in The People* v. *Fulton,* 1 *Kern.* 94.) The corporation is the congregation in whom the right of election of trustees exists. This is apparent from the 14th section of the act, already referred to, which provides " that the *corporation* of the Methodist Episcopal Church in the city of New York shall be and hereby are authorized to continue to elect nine trustees of the said corporation." Section nine of said act is in harmony with this view. It provides that " whenever any religious corporation within this state,

other than the chartered corporations, shall deem it necessary and for the interest of such religious corporation to reduce their number of trustees, it shall and may be lawful for any such religious corporation to reduce their number of trustees at any annual meeting." The trustees have no annual meeting, the corporation have, and it is composed of the male members of full age, who are stated attendants on divine worship in said church, for the time required by the act and have contributed to its support. These provisions admit of but one construction. But if any doubt has heretofore existed on this subject, it is now removed by the decision of the court of appeals in the case of *Robertson* v. *Bullions*, (1 *Kernan*, 243.) That court holds that the society and not the trustees constitute the body corporate, that the societies are themselves incorporated, that their members are the corporators, and that the trustees are the managing officers of the corporation. That " the provision giving to every member of the corporation the privilege of voting, and the entire omission of any requirement in respect to the religious views or opinions of the persons to be elected as trustees, afford unmistakeable evidence that no very rigid adherence to any particular creed or doctrine was contemplated, so far as concerned the management of the temporal affairs of the society, but that it was intended to leave all this to be regulated and controlled by the members of the corporation through the exercise of their legitimate corporate powers. That the trustees can execute no trust except such as is acceptable to the majority of the congregation." That " the whole act shows that it was the intention of the legislature to place the control of the temporal affairs of these societies, in the hands of the majority of the corporators, independent of priest, or bishop, presbytery, synod, or other ecclesiastical judicatory."

These views, I think, are also sustained by section 11 of the said act, to which particular reference will be made in another connection. Chancellor Kent holds, (2 *Kent's Com.* 314,) that the powers given to trustees of religious societies incorporated under this act, are limited to purchase and hold real estate and then to demise, lease and improve the same *for the use of the*

*congregation.* It was an incident, at common law, to every corporation, to have a capacity to purchase and alienate lands and chattels unless they were specially restrained by their charter or by statute. Independent of positive laws, all corporations have the absolute *jus disponendi* of lands and chattels, neither limited as to objects, nor circumscribed as to quantity. And this common law right as to disposition continued in England until it was taken away by several restraining statutes. These statutes were passed in the reign of Elizabeth and one in the first year of her successor, restraining alienations of church property by religious corporations, and restricting the power of leasing the same for a longer period than 21 years or three lives, or below the accustomed rents. (*See* 1 *Evans' Stat.* 381 *to* 390.) These disabling acts have not been re-enacted in this state, but the better opinion upon the construction of the statute for the incorporation of religious societies is that no religious corporation can sell in fee any real estate without the chancellor's order. (2 *Kent's Com.* 314.) Chancellor Walworth holds, in *De Ruyter* v. *The Trustees of St. Peter's Church,* (3 *Barb. Ch.* 122,) that "these statutes forming part of the law of England at the time of the settlement of this state by colonists from England, under the charter of the Duke of York, were probably brought hither by those emigrants and became a part of the laws of the colony, although they were not re-enacted here. For it is a natural presumption, and therefore adopted as a rule of law, that on the settlement of a new territory by a colony from another country, and when the colonists continue subject to the government of the mother country, they carry with them the general laws of that country, so far as those laws are applicable to the colonists in their new situation."

The chancellor thereupon holds that there was a common law existing in this state restraining religious corporations from alienating church property, and that the same could not be done until the legislature passed the act of March, 1806, authorizing the chancellor, upon the petition of the corporation, to make an order for such sale. (*See also the case of Bogardus* v. *Trinity Church,* 4 *Paige,* 198.)

Such being the state of the law, the act of March, 1806, was passed, making it lawful for the chancellor of this state, upon the application of any religious *corporation*, in case he shall deem it proper, to make an order for the sale of any real estate belonging to such corporation, and this is the language of section 11 of the act relative to the incorporation of religious societies, before referred to. (1 *R. S.* 298, § 11.) This court having, since the constitution of 1846, succeeded to all the powers and authority vested in the chancellor, the application is now necessarily to be made to this court.(*a*) But it cannot escape observation that the application can only be made *by the corporation*, and that this court has no power to make such order, except on such an application. We have seen that no such authority is conferred upon the trustees of any religious corporation. That the application must be made *by the corporation* and that *the corporation* consists of " every member of the congregation having the privilege of voting," and " that it was the intention of the legislature to place the control of the temporal affairs of these societies in the hands of the majority of the corporators." The order of this court, giving its consent to a sale of said church, was made on the petition of a majority of the then board of trustees of said society. It was not then alleged, nor is it now asserted in the defendants' answer, that such application was authorized by a majority of the corporators thereof, and the answer does not deny that the same was presented in pursuance of a resolution adopted by said board of trustees at a meeting held on the 9th of April, 1855, which declared " that in the judgment of this board it is expedient and proper to make a sale of the church property in John street as speedily as possible and to erect new church buildings in or near Madison square."

If the previous conclusions arrived at are sound, the judgment or views of the board of trustees in reference to a sale of the church property were of no moment except so far as they were the expression of the opinion of that number of members of the society. It was the judgment and opinion of a majority of the

(*a*) It may also be made to the county court. (*Code*, § 33.)

members of the corporation only which carried weight and gave force and effect to the proceeding. Those who spoke the ascertained opinions of such majority, were only authorized to make such application for them, and then only the corporation spoke and acted. It might perhaps have been assumed that the trustees did represent the views of the corporation, in making the application, and that there was apparent authority for granting the consent of this court. The order is yet *in fieri*, not having been executed, and no rights having been acquired under it, it is still under the control of the court, and it is therefore competent for this court to revoke its consent to such sale. Nay, I think it is its bounden duty to withdraw its consent to the sale, it now being most apparent that such a measure is in opposition to the views of a large majority of the corporators. It is for the corporators to say what shall be done with their own property, and not for the trustees, who are creatures of their will, and who have no existence but by their suffrages. Giving to the trustees consent to sell the property of the corporators while this large majority are opposed to the measure, is giving to the agent control over the principal, making the servant greater than his master, and permitting the agent to sell the property of his principal, in spite of his solemn protest. The views and wishes of these corporators being now made known to this court, I deem it the duty of the court to withhold its assent to a sale of this church property.

This court has no power to direct or require the corporation to sell its property against its will. (*Matter of the Reformed Dutch Church in Saugerties*, 16 *Barb.* 241.) The language of Harris, justice, in that case, where the majority were in favor of the sale, which was therefore ordered and consented to by the court, is pertinent to the case now under consideration: " The remonstrants, though numerous and comprising some of the most respectable men in the church and society, are yet in *a minority*. It is the right of the majority to control in all civil affairs, and not less in the management of the temporalities of a religious society than in any other. This is a cardinal principle of our free institutions. It pervades the whole structure of

society. Where men differ in opinion the will of the majority must prevail. The rule is safe and equitable. Sometimes, though not often, the application of the rule results in individual hardship. Sometimes too, though very rarely, it is necessary to protect the rights of a minority, against the arbitrary acts of a majority. But generally, when individuals unite their interests to accomplish a common end, they should expect and be willing that a majority of the associates should govern in all matters of common interest. They may be supposed to enter the society with the knowledge that they are to be governed by this principle."

But the defendants plead in bar to the relief asked for by the complaint in this cause, the submission and award made by Bishop Simpson, which they insist is a final disposition of the question as to the sale of the church and who are the legally elected trustees of the corporation. The present plaintiffs were not parties to that submission, and consequently are not bound by the award, however legal and binding it may be on the parties to it. (*Delafield* v. *Colden,* 1 *Paige,* 139.) It was not competent, in my judgment, to submit the question, as to whether or not the church should be sold, to any tribunal, other than that pointed out by law. We have seen that the corporation itself has no power to sell its real estate, without the consent of this court. It could not therefore submit that question, to any other tribunal, and no arbitrator can say that such real estate shall or shall not be sold. That is a matter resting solely in the discretion of this court, and cannot be lawfully delegated to any one else. The award that the property should be sold, binds no one, and gives no authority to make the sale. So an award that it should not be sold, cannot control the discretion or power of this court to consent to a sale, on a proper application of the corporation for that purpose. I have no doubt, therefore, that the award of Bishop Simpson that the church should be sold, and its confirmation by an order of this court, present no obstacle to the relief asked for by the plaintiffs.

So in like manner the plaintiffs are not bound by the submission of the question as to who were the legally elected trustees

Wyatt *v.* Benson.

of the corporation. A submission and award in reference to that question could not legally determine who are the duly and lawfully elected trustees of this corporation. A proceeding on the part of the people is the only conclusive form known to the law definitely to settle that question, and an award like that interposed in this case presents, in my judgment, no obstacle to the plaintiffs calling in question the right of the defendants to act as the trustees of the First Methodist Episcopal Church. Even though the defendants be the legally elected trustees of the society, they have not, in my opinion, any right or power to institute or carry on proceedings to sell the real estate of the society, without the consent of a majority of the corporators.

I am therefore of the opinion that the consent of this court to the sale of said church, given on the application of a portion of the trustees, and not sanctioned by a majority of the corporators, should be withdrawn and revoked, and that an injunction should issue to restrain the defendants from taking any further proceedings in relation to a sale of the same.

I cannot close my investigation of this case, without the expression of my deep regret at witnessing the painful and bitter state of feeling engendered in this society in reference to the removal of a portion to the upper part of the city, and their desire that the church of their fathers should be sold and no longer be used for the holy purposes for which it has been so long consecrated. This movement, as has been seen, is most strenuously opposed by the large majority of the corporators who yet remain, and still linger around the old house of worship. It is not surprising that they cling to its hallowed walls with affection and earnestness, and resist every effort to drive them from this cherished spot. I shall indulge the hope that some amicable mode for a fair and just division of this property, among those who have by inclination or necessity been compelled to remove to another part of the city, and those who remain, may yet be found and adopted. It certainly cannot be difficult to devise a plan which will insure justice to all, and permit this venerable edifice yet to remain " for the service of the Almighty God, after the manner of the people called Methodists."

---

The People *v.* Stout.

---

I cannot better express my own views than to use the language of Judge Harris in the case quoted above. He says, "those who prevail in this controversy should not forget that the minority as well as themselves have their rights. These rights should be tenderly regarded, and the more so because they *are* the rights of the minority. It is quite evident, I think, that the parties are not likely, successfully, to maintain two distinct organizations. Under these circumstances, sound policy, as well as the more exalted principles by which all the parties profess to be actuated, require that the most enlarged forbearance should be habitually exercised, and the most liberal concessions made towards those who have hitherto opposed the action of the majority."

[NEW YORK SPECIAL TERM, January 21, 1857. *Davies*, Justice.]