PETER G. COOPER and others *vs.* THE TRUSTEES OF THE FIRST PRESBYTERIAN CHURCH OF SANDY HILL.

A religious corporation, through its trustees, who are by statute invested with the temporalities of the corporation, has the right to regulate the use of the meeting house, to make repairs, alterations and improvements; and the pew-owners take and hold their privileges in subordination to the rights of the corporation.

A pew-owner has no separate or individual property in the timber or materials of which the house, or any of its parts, is composed, or in the soil below the pew, but his right is that of occupancy of the pew during public

Cooper *v.* First Presbyterian Church of Sandy Hill.

worship; and this right of occupancy must yield to circumstances of necessity, convenience and expediency, growing out of the rights in common of the society.

Although the change in the internal arrangement of a church edifice is merely expedient, or matter of convenience to the society, still the trustees, in behalf of the corporation, may legally direct the alteration, and the pew-owners who shall be deprived of their rights in their pews, must be content with a just and adequate compensation.

The right of a pew-owner, not being absolute, but qualified by, and subject to, the right of the trustees to alter the internal arrangement of the church as the good of the society may require, no constitutional objection arises when, in the exercise of such right by the trustees, the pew is destroyed from necessity, or for purposes of expediency or convenience.

Although there is a presumption in favor of the acts of trustees, as agents or officers of the corporation, yet pew-owners will not be *concluded* by the exercise of an arbitrary and despotic will, on the part of the trustees, in determining the question of necessity, expediency and convenience.

They must carry out the reasonable and legal will and wishes of the corporation. They will be presumed to do this, in regard to repairs, improvements and changes made on the church property, in the absence of any allegation that they are acting against the will and wishes of the body they represent.

MOTION, upon complaint, affidavits, &c. for an injunction.

*Orville Clark, Urias G. Paris* and *A. D. Wait,* for the plaintiffs.

*Hughes & Northup,* for the defendants.

BOCKES, J. This is a motion for an injunction, by six pew-holders in a church, to restrain the trustees from removing their pews and erecting slips or other structures in their place.

This motion must be determined on the papers before me, which show that the paper title to the premises on which the church edifice is situated still remains in the original patentees of the township. The lot, previous to and until 1825, had been used as a public burying ground; and, as was held in *Hunter* v. *Trustees of Sandy Hill,* (6 *Hill,* 407,) was dedicated to public use. In that year, one Gibson erected the

church edifice on this lot, with the purpose and on the understanding with a number of the inhabitants of the vicinage, that it should be a house of public worship, and Gibson was to be reimbursed for his outlay by a sale of the pews and slips. After the edifice was completed, Gibson gave to the purchasers of the pews and slips, certificates or deeds of sale therefor, and such purchasers and their assignees and grantees have ever since occupied them for purposes of public worship. The form of these certificates or deeds is not given—hence the precise nature and extent of the right intended to be granted to the pew and slip-holders, do not with certainty appear—but it is alleged that the purchasers and those claiming under them occupied the pews and slips, claiming title thereto "for the purpose of public worship." The religious society worshiping in this house, organized at a meeting held on the 18th October, 1825, and filed their certificate of incorporation in the clerk's office of Washington county, where it was recorded on the 13th January, 1826, by which said society became incorporated as a religious society, under the name of "The Presbyterian Church of Sandy Hill." This certificate of incorporation purports on its face to have been made "at a meeting of subscribers to the church," and agreeably to the act of 1801, providing for the incorporation of religious societies, and therein Reuben C. Gibson, the person who is alleged to have erected the building, is named as one of the trustees. In 1848, for some reason not appearing on this motion, the society reorganized under the name of "Trustees of the First Presbyterian Church of Sandy Hill." From the first organization in 1825 to the present time, the temporalities of the church have been managed and conducted by trustees, elected from time to time, and their possession of the church edifice and the rights of the pew and slip-owners therein have been, in practical observance, the same in all respects as in those cases where the title was in the corporation.

It is clear that the premises embracing the church edifice

Cooper *v.* First Presbyterian Church of Sandy Hill.

were dedicated to the public for a definite, legal purpose, and having been held and enjoyed by the society in its corporate capacity since 1825, the title, as between the corporation and the pew-owners, must be deemed to be in the corporation, for the purposes of the organization.

So far as this case is concerned and for the uses to which the real estate has been for thirty-five years appropriated, the title of the patentees must be deemed subservient to the claim and rights of the incorporation. Especially must this be so held in the absence of any claim by the patentees or of any one claiming under them. And as regards Gibson, who in fact had no title whatever, all claim from and under him must be held subservient to the rights growing out of the common and public purpose, carried into effect through him, and consummated by the incorporation of the society.

There may be a dedication for pious and charitable purposes as well as for highways and other public easements. Judge Beardsley remarks, (6 *Hill,* 411,) "Dedication is the act of devoting or giving property for some proper object, and in such manner as to conclude the owner. The law which governs such cases is anomalous. Under it, rights are parted with and acquired in modes and by means unusual and peculiar. Ordinarily, some conveyance or written instrument is required to transmit a right to real property; but the law applicable to dedication is different. A dedication may be made without writing, by act *in pais* as well as by deed. It is not at all necessary that the owner should part with the title which he has, for dedication has respect to the possession and not the permanent estate."

The edifice was erected with a view of making it common property, for the purpose of public worship, on a lot then dedicated to public use. The society was immediately incorporated. Gibson became one of the incorporators, and with the other trustees had possession, and transmitted possession to his successors; and the corporation has ever since con-

trolled it as church property. All this is conclusive on the question of general and common intent.

For the purposes of this motion I must regard the title, and the legal possession, of the church edifice to be in the corporation, (1 *Kernan*, 94, 243,) and that the rights of the plaintiff are those ordinarily attaching to pew-owners.

The question is, therefore, whether these pew-owners present a case for an injunction against the corporation, to prevent the demolition of the pews.

Chancellor Walworth, in defining the right of a pew-owner, remarks, that the grant of a pew in perpetuity does not give to the owner an absolute right of property; that the grantee is only entitled to the use of the pew for the purpose of sitting therein during service. It was laid down in *Wheaton* v. *Gates*, (18 *N. Y. R.* 404,) that the interest of pew-holders did not constitute them owners or part owners of the lot; that such interest consisted in a right to occupy their respective pews, as a part of the auditory upon occasions of public worship. So Judge Hand says, "The pew-owner does not have a right to the soil upon or over which the pew stands, but only a right to use the pew as a seat in a place of public worship, subject to the more general right of the corporation in the soil and freehold." He adds, that "from the very subject matter of the conveyance, the pew-owner must be presumed to have taken it subject to all the conditions and limitations incident to such property."

What then are those condition and limitations? for, on determining them, it may be seen whether the plaintiffs have been or are improperly disturbed in the use and enjoyment of their pews.

The incidents alluded to are those resulting from decay, dilapidation and casual injury to or destruction of the property, and from the right possessed by the corporation to make such proper and appropriate changes and improvements as health and comfort demand. Judge Paige says, "The trustees can, for useful purposes, and to carry out improve-

ments, take down and remove the pews of the pew-holders. The property of the pew-holders in their pews is necessarily subject to the right of the trustees to alter and improve the internal arrangements of the church as the good of the society may require."

This right to change or take down pews rests in necessity or propriety. If a necessity exists, this right may be exercised without compensation to the pew-holder. There is still a right in the corporation to change or take down pews depending on propriety, which however cannot be exercised without recompense. It was held in *Howard* v. *First Parish in North Bridgewater*, (7 *Pick.* 138,) that a parish may take down their meeting house in order to rebuild, either as matter of necessity or of expediency: in the former case they are not, and in the latter case they are, bound to indemnify the pew-holder for the loss of his pew. In this case the court remarked, that " although the parish have a *right to take down* a meeting house which may be in *good condition*, in order to build one in better taste or of larger dimensions, yet in such case they must make compensation." So, too, it was held in *Gay* v. *Baker*, (17 *Mass. R.* 435,) that a parish might, "when necessary, take down the house and rebuild on the same ground, or may alter the form and shape of it for the purpose of making it more convenient. If in doing this the pews are destroyed, the parish must provide an indemnity for the pew-holders on just and equitable principles; it being a necessary condition of the property in a pew that it shall be subject to the regulations of the parish for useful purposes." The principle of this case is approved in *Wentworth* v. *First Parish in Canton*, (3 *Pick.* 344.) Judge Parker remarks: "It is there, in *Gay* v. *Baker*, intimated that when, by reason of altering or enlarging a meeting house, the pews of an individual shall be destroyed, means must be provided for indemnity, and without doubt this ought to be done in case an alteration takes place for convenience only." And again it was held in *Kimball* v. *Second Parish in Row-*

*ley,* (24 *Pick.* 347,) that the pew-holder has but a qualified property subject to the paramount right of the parish, and they in their general dominion and superintendence may remove or change the form of the pews for the purpose of making repairs or rendering the interior more convenient, or they may destroy them altogether for the purpose of erecting or substituting a more commodious edifice. But the court adds, that "the pew-owner cannot be despoiled of his property," and holds that he is entitled to compensation, except when the house has become ruinous and unfit for use. The court then proceeds to inquire how the compensation is to be made to the pew-holder, in cases where he is entitled to recompense for the destruction of his pew by the parish. Judge Morton inquires, "How are the parish to ascertain the value of pews that they may give the owners an adequate indemnity? Must they determine for themselves, and act on the peril of a suit from every dissatisfied pew-owner? Can they compel him to receive compensation, and may they make a lawful tender of it?" The judge then proceeds to say, that the statute of that state, passed in 1817, providing for appraisals in such cases, was intended to remedy the inconvenience suggested by these questions, and he held that its terms were broad enough to embrace that case. But the learned judge adds: "Whether this statute applies or not, the defendants are justified in their conduct;" and further—"In the exercise of their rights they had incurred a pecuniary responsibility, and rendered themselves liable to pay plaintiff for his pew, as much as it was worth. Having legally taken the pew by virtue of the power vested in them, and thereby become the legal owners of it, they must be deemed statute purchasers for a fair compensation." This was a case where it appeared, as is expressly stated, that the pew was pulled down for the purpose of making the structure of the pews more convenient, which was expedient, and not from necessity or malice.

The statute alluded to in the last case cited is but declaratory of the common law, as was there directly held—the

court remarking that parishes, having before the right to re-
move pews for certain purposes, were not deprived of it by
the passage of the statute. They may therefore still rely
upon their original right, even if they have the statute right.
So, in *Daniel* v. *Wood*, (1 *Pick.* 102,) Parker, J. remarks,
that the "property in a pew in a meeting house is not abso-
lute, but a qualified property; it is an exclusive right to
occupy a certain part of the meeting house for the purpose
of attending upon public worship, and for no other purpose,
and is necessarily subject to the right in the parish to take
down and rebuild the meeting house, and make such alter-
ations as the good of the society may require. This restric-
tion upon the property grows out of the nature of the
property and the purposes to which it is applied."

He adds, "this is the *common law* of the land in relation
to such kind of property, and by the late statute (1817) this
right is recognized and the mode of executing it is established."
And he further adds: "Before the statute, the parish or
society had a right to take down and rebuild the meeting
house. And if the plaintiff has suffered in his property by
the destruction of the old meeting house and the erection of
a new one, he can have his action on the case, in which he
will recover his reasonable damages, or perhaps he may hold
a property in the new pews corresponding with his property
in the old ones by submitting to his share of the expense."
The case of *Wentworth* v. *Inh. in First Par. of Canton* (3
*Pick.* 344) recognizes this as the common law applicable to
the subject under discussion, as does also the case of *Gay*
v. *Baker*, (17 *Mass. R.* 434,) where Parker, J. says the statute
of 1817 appears to have affirmed these principles.

Without referring to the cases, it is sufficient to say that
the same principles obtain in Vermont, in regard to the rights
of pew-holders, as in Massachusetts.

I understand Judge Paige to hold the doctrine of these
Massachusetts cases when he says the trustees can "for use-
ful purposes, and to carry out the contemplated improvement,

take down and remove the pews of the pew-holders." He adds—"the pew-holder has a remedy when his pew is destroyed for convenience only." Yet he decides that the pew-holder cannot maintain either trespass or ejectment against the trustees, but the action must be to recover damages by way of indemnity for the loss of his pew. Judge Hand, in reviewing this case, (17 *Barb.* 109,) also recognizes these principles. He says, if the pew is taken "for convenience or for expediency, and not from necessity, the owner has a right to indemnity;" but he nowhere intimates that the corporation has no right to remove pews for convenience or from expediency—only that in such case the owner is entitled to compensation.

It was held in *Bronson* v. *St. Peter's Church of Auburn,* (*reported in the* 3d *vol. of Law Reporter, page* 590,) that the pew-owner has no claim that the relative situation of internal positions of the church will not be changed, nor that the church edifice shall remain unaltered. In that case a motion was made for an injunction to restrain the corporation from proceeding with a contemplated alteration of the church edifice, which involved the demolition of pews. Judge Maynard denied the motion, holding that the trustees acting in behalf of the corporation had the right to make alterations under section 4 of our statute in regard to religious corporations, which gives them power "to repair and alter their churches or meeting houses, and to erect others if necessary."

But the right of the corporation to repair, improve and alter the church exists at common law, which is not at all affected by the statute cited.

It follows, therefore, from these authorities, that the corporation through the trustees, who by statute are invested with the temporalities of the church, has the right to regulate the use of the meeting house, to make repairs, alterations and improvements, and the pew-owners take and hold their privileges in subordination to the rights of these corporations.

A pew-owner has no separate or individual property in the

Cooper *v.* First Presbyterian Church of Sandy Hill.

timber or materials of which the house or any of its parts is composed, but his right is that of occupancy of the pew during public worship, and this right of occupancy must yield to circumstances of necessity, convenience and expediency growing out of the rights in common of the society. These principles are the plain dictates of natural justice and cultivated reason, and are so eminently just in their application, as to seem a necessary concomitant of church property in our country.

The charge in the complaint that the defendants are actuated by malicious motives in removing the pews, and that they have subverted the use of the house from a place of worship into a market and grocery, is fully met and explained by the affidavits read on the motion. At a meeting of the society the trustees were, by a vote thereof, instructed to repair and alter the pews and slips, and they, in pursuance of such instructions and of a resolution adopted by them, proceeded to make the alterations complained of. The trustees allege that in their opinion the change and alterations are necessary to the comfort, convenience and wants of the society; and state the grounds of such belief, which, to my mind, are reasonable and adequate. They deny that they were actuated by malicious motives, but assert their good faith in all they have done or intend to do.

According to the authorities above considered, they are pursuing a perfectly legal course of action; for if the change in the internal arrangement is merely expedient or matter of convenience to the society, still the trustees, in behalf of the corporation, may legally direct the alteration, and the pew-owners who shall be deprived of their rights in their pews must be content with a just and adequate compensation. The rights of all pew-owners in all churches, unless there are some unusual or peculiar circumstances qualifying such rights, are subject to the exercise of this power by the corporate authorities.

It will be readily perceived that the conclusions sanctioned

by the authorities cited are not obnoxious to the constitutional objection, for the reason, that the right of the pew-owner is not absolute, but is qualified by and subject to the right of the trustees to alter the internal arrangements of the church as the good of the society may require. Therefore, no right of the pew-holder is invaded or taken from him when the pew is destroyed from necessity or for purposes of expediency or convenience.

It becomes important now to inquire how the question of necessity, expediency and convenience is to be settled. Can the trustees determine this, and are all the pew-owners to be concluded by their judgment, or perhaps caprice? Clearly not concluded. There is a presumption in favor of their acts as agents or officers of the corporation, inasmuch as they are invested with the temporalities of the church; but I apprehend they cannot conclude the question suggested, by the exercise of an arbitrary despotic will. They must carry out the reasonable and legal will and wishes of the corporation. They are presumed to do this in regard to repairs, improvements and changes made on the church property, in the absence of any allegation that they are acting against the will and wishes of the body they represent.

It was decided in *Robertson* v. *Bullions*, (1 *Kernan*, 243,) and see remarks of Brown J. in *The Parish of Bellport* v. *Tooker*, (29 *Barb*. 272,) "that a religious corporation under the statute consists not of the trustees alone, but of the members of the society; that the society itself is incorporated, and its members are the corporation; that the relation of the trustees to the society is not that of a private trustee to the *cestui que trust*, but they are its officers, with the powers of the officers of other corporations.

But passing the fact that this action is against the corporation by its corporate name, and that the acts complained of are alleged to be the acts of the corporation, which presupposes legal unanimity among the corporators in regard to such acts, how are the wishes and will of a religious corpo-

ration to be determined? There can be no other way than in some manner to learn the wishes of a majority, and those wishes when known and duly expressed must conclude, unless so palpably unjust as clearly to indicate an arbitrary, wanton and destructive purpose. Judge Harris says, (16 *Barb.* 243,) "It is the right of a majority to control in all civil affairs, and not less in the management of the temporalities of a religious society than any other. This is a cardinal principle in our free institutions. It pervades the whole structure of society. When men differ in opinion, the will of the majority must prevail. The rule is safe and equitable. Sometimes, though not often, the application of the rule results in individual hardship. Sometimes, too, though very rarely, it is necessary to protect the rights of a minority against the arbitrary acts of a majority. But generally, when individuals unite their interests to accomplish a common end, they should expect and be willing that a majority of the associates should govern in all matters of common interest. They may be supposed to enter the society with the knowledge that they are to be governed by this principle." The soundness of these observations and their practical equity must commend them to the conscience and candid judgment of every one. Mr. Justice Davies quotes them with approval in *Wyatt* v. *Benson,* (23 *Barb.* 335, 6.)

In *Livingston* v. *Lynch,* (4 *John. Ch. Rep.* 596,) Chancellor Kent lays it down as the well settled law of corporations, that the voice of a majority shall control. The rule is based on grounds of public good and convenience.

The clear expression of the majority of the corporators, therefore, is the will of the corporation—which will is presumed to be manifested by the action of the trustees. When it is desirable to obtain especial sanction for any contemplated proceeding—and it is well to secure such sanction in all matters of importance—the trustees should call a public meeting of the members of the society, and the expression of that meeting, if fairly obtained, would be clear and reliable

authority on which the trustees might safely act. Then the contemplated alterations and improvements could be discussed and the expenses considered, among which would naturally be such as might be incurred by the necessary removal of or injury to the pew or slip of any member. Generally no expense of this kind would be incurred, for no one would be driven from the church, but a seat or right of occupancy during public worship—which was all any one possessed—would be provided ; and if as good and equally commodious and comfortable, although in different form, no claim for damage could be sustained.

In the exercise of its powers, the corporation, through its officers, must act with due regard to the object of the organization, equalizing to the greatest possible extent the privileges and burdens among the members, so as to secure general comfort in the enjoyment of common rights.

If the forgoing conclusions are well based—and they are sanctioned by numerous decisions—the motion for an injunction must be denied.

But there is another unanswerable objection to the motion. The plaintiffs ask for an injunction to restrain the defendants from destroying their pews, and from erecting other structures in their place. But it is shown that the pews were in fact taken down and removed before the commencement of this action ; therefore no case for an injunction then existed, or now exists, to prevent the removal of the pews ; nor can the plaintiffs enjoin the defendants from erecting other structures, as slips or seats, in the place of the pews removed.

The cases above cited all agree in this—that a pew-holder has no right beyond that of using the pew as a seat in the church edifice. He has no exclusive right in the soil below the pew, or in the timber or materials of which the house or any of its parts is composed ; and when this use is destroyed, his right, if any remains to him, is a right of indemnity or compensation for the injury. If the authorities settle any thing, they demonstrate and establish this conclusion.

A difficulty suggests itself to me in the form of the action, which, however, was not discussed before me, and I shall not therefore take it into consideration in the decision of the motion. But it may be well to draw the attention of the counsel to it at this early stage of the action. Can the plaintiffs join in an action for the relief demanded on the case presented, or can they, being separate pew-holders, join in an action for any relief whatever, based on their rights as pew-holders? It is held in *Shaw* v. *Bevenidge,* (3 *Hill,* 26, 27,) that pew-owners hold their particular seats in severalty—that their rights are distinct and separate. Have the plaintiffs a common right, or, do they show more than this, that the defendants have injured and intend further to injure them in their separate rights? (*See Bouton* v. *The City of Brooklyn,* 15 *Barb.* 375, also opinion of Judge Hand, in manuscript, in Judson and others v. Judd and others.) On this point I intimate no opinion. The motion for an injunction must be denied with ten dollars costs.

[SCHENECTADY SPECIAL TERM, July 28, 1860. *Bockes,* Justice.]