WHEATON *et al.* AND THE TRUSTEES OF THE FIRST CONGREGATIONAL SOCIETY OF SYRACUSE *v.* GATES *et al.*

The powers of the trustees of a religious corporation cannot be enlarged or extended by a County Court, in an order for the sale of the real estate of such corporation and the application of the proceeds.

Such trustees have no authority to distribute the property of the society among the individual members, or any class of them, nor can it be conferred by the vote of a majority of the members, and the order of the court.

The court cannot approve of any plan for the application of the proceeds of the sale of real estate, which does not regard the interests of the society as an organization to continue for the purposes of its creation.

Where it appears, from the application, that a sale is sought for the purpose of distributing the proceeds among the pew holders, the court has no jurisdiction to grant the application, and its order is inoperative.

*It seems* that pew holders, as such, have no interest in the land upon which a church stands, but that their rights cease when the edifice is destroyed or becomes permanently unfit for public worship, *per* DENIO, J.

Section 30 of the Code confers no jurisdiction on the County Court to appoint a receiver of the effects of a religious corporation, but only the special jurisdiction, vested in the chancellor by 2 *R. L.*, 218, § 11, to direct the application, by the corporation itself, of the proceeds of a sale of real estate.

APPEAL from the Supreme Court. The general object of the action was to obtain a judgment declaring null and void a certain order of the County Court of Onondaga county, purporting to authorize the sale and conveyance of the church edifice and lot of the incorporated religious society, called the First Congregational Society, Syracuse, and to direct the distribution of the proceeds of such sale; and another order of the same court appointing the defendant Gates a receiver of said corporation, and authorizing him to reduce its personal property into money, pay its debts and distribute the surplus among the pew owners; and to vacate certain acts done pursuant to said orders, and to reinstate the corporation in its rights in the premises. The plaintiffs also sought to obtain a judgment of the court, declaring what persons were the legal trustees of the corporation. Issue being joined, the case was referred to WILLIAM F ALLEN as a referee. By his report, which it was agreed contained the material facts (no case having been settled), it appeared that said corporation was created in August, 1838, pursuant to the general act providing for the incorporation of religious societies, the church having been organized a few months before; and that the corporation soon afterwards purchased a lot of ground and erected a church edifice thereon, which lot, at the commencement of this controversy, was subject to a mortgage for about $2,700; besides

which the corporation owed other debts, amounting to $300 or $400, and had personal property to about an equal amount. The lot was represented to be worth $7,000 or $8,000. The building was of wood, and not well adapted to the wants of a large congregation.

On the 25th of July, 1853, a petition was presented to the County Court, verified by four of the six trustees of the corporation, namely, the defendants Bates, McDougall and Maltby, and the plaintiff Davis, and having annexed to it the written concurrence of several members of the society. It set forth, besides the foregoing facts, that the lot had become valuable for building purposes, and that half its value would purchase another site, better situated for the purposes of a church; that a resolution recommending the sale of the lot had been passed with great, though not entire unanimity, at a meeting of the society, and although it had been reconsidered at a subsequent meeting, a large majority of the members of the society were in favor of a sale; and at a meeting still later than that mentioned, it had been voted that a petition should be prepared and submitted to the society, and that it was subsequently so submitted and was approved by a vote of nine to three. The petition further stated that the members of the society had various views in regard to the future plans and policy of the society, and that the petitioners believed it would be difficult, in the present condition of things, to raise means sufficient for the support of a pastor having ability and fitness suitable for the advancement of the best interests of the church and society, or to raise the sum of $1,200, which was required to be paid on the mortgage. It set forth that there were about one hundred pews in the church, most of which had been sold from time to time, and were then owned by various members of the society. The prayer was that the church might be sold, and that the proceeds, after paying the debts, should be distributed among the persons who held deeds of pews, in proportion to the

sums respectively paid for them, and if there was more than enough to reimburse all that had been paid on the purchase of pews, the surplus to be distributed among said pew owners in the same proportion. The County Court thereupon made an order directing the trustees to sell and convey the real estate, and to apply the proceeds in the manner prayed for in the petition. On the twenty-sixth of August following, the court modified this order by providing that parties holding contracts or articles for pews should share in the distribution of the moneys in the same manner with those holding deeds. Pursuant to the first mentioned order, the premises were sold at auction to R. F. Stevens, for $8,610, subject to the mortgage above mentioned. He paid $500 down. A deed was executed to him, and he gave back to the trustees a bond and mortgage for the balance of the purchase money. Subsequently, Stevens sold to C. A. Wheaton, one of the plaintiffs, who, by the complaint, stated that he was willing to have the sale vacated, provided he could be made whole and restored to his original situation. After the sale, a disagreement arose between the trustees respecting the disposal of the proceeds, and the disposition to be made of the personal property; three of them, the plaintiffs Clark, Wheaton and Davis, declining to proceed, and the defendants Bates, Maltby and McDougall, the remaining three, wishing to execute the order of the County Court, and to sell the personal property and distribute the proceeds among the members of the society, including the female members of the church; a vote to that effect having been passed at a society meeting on the 13th of September, 1853. On the 5th of May, 1854, the County Court, on a petition and affidavits presented by the trustees, who are defendants, and certain members of the society adhering to their party, made an order appointing the defendant H. B. Gates "receiver of all the money, property, estate and effects" of the society. "with the usual powers and directions." He was directed to sell the personal property and divide the proceeds among

the pew owners and holders of pew claims, in the manner mentioned in the former order respecting the proceeds of the sale of the real estate.

On the 23d of August, 1853, a church meeting was held, at which it was resolved by a divided vote, several persons declining to vote, to disband the church. Subsequently, another meeting of other members of the church was held, which adopted resolutions declaring the former resolution "an unwarrantable assumption of power and wholly void." On the 26th of September, 1853, the members of the First Congregational Church, who favored the policy of dissolving it, organized themselves into a Congregational church under the name of the Plymouth Church of Syracuse, and called and settled a pastor. They used the old church as a place of worship, under a lease from the purchaser, until February, 1855, when they removed to a building which they had erected for their own accommodation. Those who wished to continue the former organization have met for public worship at a room called Market Hall, but have had no stated minister or regular preaching.

The facts touching the respective claims of the several parties to be the legal trustees are as follows: The six persons above mentioned were the trustees in the summer of 1853, when the order to sell the church was obtained. Bates and McDougall were legally reëlected on the ninth of August of that year. Their respective terms of office would expire as follows: Wheaton and Davis in 1854, Maltby and Clark in 1855, and Bates and McDougall in 1856; the twentieth of August being the anniversary. On the 26th of October, 1853, those members of the society who sympathized with the present plaintiffs, and were unconnected with the Plymouth organization, held a meeting to elect trustees in the place of Bates, McDougall and Maltby, who, it was assumed, had vacated their places by "their removal or withdrawal," and three other persons were accordingly elected.

On the 8th of August, 1854, the members who had formed the Plymouth organization, held a meeting in the old church, and claiming to be, when thus convened, " The First Congregational Society of Syracuse," agreed by resolution to reduce the number of trustees of that corporation from six to four, which was effected by omitting to elect trustees in the place of Wheaton and Davis, whose terms were about to expire.

The referee found, as a matter of fact, that there was no necessity for selling either the real or personal property of the corporation for the payment of its debts; that one object for which the sale was procured was to effect a division of the property among a portion of the members; that this was the sole object of some of those who promoted it, while others had only in view the changing of the site of the house of worship.

The referee decided that the order for the sale of the church lot was void on account of the provision for the distribution of the proceeds among the pew owners, which he held to be illegal, and for the reason that the sale was not asked for or ordered for any lawful purpose, but with a view to such disposition of the avails; that the order appointing Mr. Gates receiver was also void, for want of jurisdiction in the County Court to entertain proceedings for such a purpose; and that everything done under these orders should be set aside, and the corporation be restored to its rights; that the vote to reduce the number of the trustees of the First Congregational Society was void, for the reason that it was adopted by a new and separate organization, distinct from the corporation for which, in passing that vote, they attempted to act; and that the vote to displace Bates, Maltby and McDougall, and to choose others in their stead, was likewise void for the want of evidence that the former had become disqualified by removal or refusal to act; but he did not decide whether these trustees had or had not abdicated their offices by their acts in setting up a new

organization. He held the reëlection of Wheaton and Davis to be legal. Certain directions were then given for the settlement of the accounts of the receiver and of Wheaton, to whom the purchaser of the real estate had conveyed, and in regard to the costs, which it is unnecessary to state, as it was not claimed by the counsel for the appellants that they were erroneous, if the other portions of the judgment could be sustained. Judgment having been entered in conformity with the report, and affirmed at a general term, the defendants appealed.

*N. B. Smith*, for the appellants.

*J. L. Newcomb*, for the respondents.

Denio, J. The act to provide for the incorporation of religious societies contains a provision in the following language : " That it shall be lawful for the chancellor of this state, upon the application of any religious corporation, in case he shall deem it proper, to make an order for the sale of any real estate belonging to such corporation, and to direct the application of the moneys arising therefrom, by the corporation, to such uses as the same corporation, with the consent and approbation of the chancellor, shall conceive to be most for the interest of the society to which the real estate so sold did belong." (2 *R. L.*, 218, § 11.) This jurisdiction was vested in the County Courts by the Code. (*Laws of* 1851, *App.*, *p.* 11, § 30, *subd.* 9.) It was not the purpose of these enactments to confer upon the magistrate or courts mentioned, any original power to control or manage the property of religious societies. Such a power would scarcely consist with the principle of universal toleration of all religious opinions and organizations, and the abstinence of all intermeddling in their affairs, which is a cardinal doctrine in our institutions. The whole power of administration was conferred upon the trustees (*Act*, § 4), with the single qualification that if the corporation desired

to dispose of any of its real estate it should apply to the court for its allowance of the transaction; and as to the disposition of the proceeds, the court has no power to originate any scheme, or even to execute any enterprise determined on by the corporation, but only to allow or disallow the application of the moneys to such purposes as the corporation shall represent to be most for the interest of the society. It follows from this view of the statute that the powers of the trustees cannot be enlarged or extended by means of any order which the County Court may make under this provision. In determining, therefore, whether the measure which the defendants wish to consummate, and which the plaintiffs seek to enjoin, is lawful, we must inquire whether it is warranted by the authority vested in the trustees. If it is so warranted we can pass no judgment upon its wisdom or expediency; if not, the allowance of the County Court goes for nothing. The question is essentially the same as though there was no restraint upon the power of the trustees, except such as arises out of the nature of their office and the general scope of the statute.

The scheme of the trustees, conceding that the application to the County Court was made by the authority of the board, was an entire one—to sell the church lot and dispose of the proceeds in the manner stated in the petition and in the order. They did not ask to sell in order to pay the debts, and that the balance of the proceeds might remain in the treasury, subject to future appropriation for the purposes of the society. Upon the statement in the petition the debts amounted to only a small proportion of the value of the property, and if we look to the auction sale which was eventually made, it will be seen that there was a surplus of nearly $9,000, after providing for the mortgage of $2,700; and the remaining debts were trifling, not much exceeding the value of the personal property. It is not represented in the petition that a sale was necessary for the payment of the debts, and the referee has found that such a

Wheaton *v.* Gates.

necessity did not in fact exist. The petition asked that this considerable surplus should be distributed among the pew holders, and the court so ordered. The general scope and object of the proceeding, it appears to me, was the division of the property of the society among the owners of pews. The sale was sought for that purpose, and the payment of the debts was only incidental. The property was only what should remain after the debts were paid, and as nearly the whole indebtedness was a lien upon the land, no system of distribution could be adopted which did not provide for the debts. But if I am mistaken in the supposition that the distribution was the main object of the proceeding, it certainly constituted an important portion of that entire measure; and if that feature was illegal, the measure itself, as a whole, was contrary to law. The trustees had no authority to distribute the property of the society among its individual members, or any class of them. Their duty was to preserve and administer it in the promotion of the purposes for which the corporation was created. The court could not, according to the statute, approve of a plan for any application of the moneys arising upon a sale, except one which was considered to be for the interest of the society, as an association which was to continue organized for the purposes of its creation. There is a sense in which it might promote the interests of the individuals composing this religious organization to dissolve their connection and establish new relations, but this is not what is meant by the statute. It was not in the power of the trustees, or a majority of the members of the society, or the County Court, or of all these authorities together, to abolish the corporation, or dissolve the society. If every individual having any interest in the matter should concur it might be done; because there would be no one to question the act. But while any number of the members desire to continue the connection, all the others cannot by their own act dissolve it. Now it is not possible that it could be considered

to be for the interest of the society, in the legal and proper sense of that expression in the statute, to dissolve it and distribute its property among its individual members. When, therefore, the County Court was asked to approve a transaction of which such a distribution was the prominent if not the only important feature, a case was not presented for the exercise of its jurisdiction. It was asked to exercise its judgment upon a question of which it could not legally take cognizance. It may be that if leave to sell had been applied for without any statement of the purpose to which the money was to be applied, that the court would have had jurisdiction of the matter. But such was not the case. It cannot be affirmed that the applicants would have sought or accepted the order but for the privilege of dividing the money in the manner mentioned. The application was entire. It was for leave to sell, not wholly or principally for the purposes of the society, but mainly for the behalf of the pew holders, with some incidental provisions which concerned the society. In granting such an application, the court departed from the jurisdiction which the statute had conferred. The law authorized it to pass upon the expediency of acts proposed to be done by the trustees in the execution of their duties. It, in fact, approved of an act which was in itself a breach of trust. The order, I think, was wholly inoperative.

The interests of the pew holders did not constitute them owners or part owners of the lot. That consisted in a right to occupy their respective pews, as a part of the auditory, upon occasions of public worship. If the edifice were destroyed, or if it became permanently unfit for the purposes of public worship, their rights ceased. I do not say what interests they would retain in the case of extensive and costly reparations and great changes, not destroying the identity of the building, for that question is not before us ; or whether objections on their part ought not, in a case which may be supposed, where the edifice continued fit for

occupation, to prevent the court from approving an application for a sale not otherwise objectionable. Where the edifice was reasonably capable of further use as a church, the interests of the pew owners would no doubt be a subject to be considered by this court. But if overruling considerations existed rendering it expedient upon the whole matter that a sale should take place, the interests of the owners of pews would necessarily be destroyed. (*Freligh* v. *Platt*, 5 *Cow.*, 494; *Matter of the Reformed Dutch Church in Saugerties*, 16 *Barb.*, 237.) Therefore, when the County Court determined that this edifice should be sold, the decision, if valid, put an end to the rights of the owners of pews, and the direction that the proceeds should be paid to them was simply a gift of the property of the society. But it is apparent from the proceedings that it was not supposed that their pew rights were worth the money they were to receive. No account was to be stated as to the value of these rights. They were to have all the money which the lot should bring after discharging the debts, though it might exceed all that they had originally paid for the pews; and this without any regard to the circumstance that the church had been used many years and had become unsuitable as a place of worship for the congregation.

The want of jurisdiction in the court to authorize such a transaction would be fatal to the title of the purchaser, if he were here seeking to sustain his purchase. As he would have to make title through the order, he would be chargeable with notice of its provisions, and of the application upon which it was granted. But that question is not presented. Mr. Wheaton, who has succeeded to the interest of the purchaser and is one of the plaintiffs, offers to relinquish any title he may have. There are, therefore, no pecuniary interests involved in the decision, except such as the pew owners claim; and we have seen that in the case of a legal sale their rights are extinguished.

The principal motive which the defendants can have in seeking to sustain the appointment of a receiver, is to enable the bond and mortgage given by Stevens to be collected and the avails distributed. As those securities are to be given up on the sale being declared void, there would be very little for the receiver to do if his appointment should be sustained. But there is a more formidable difficulty to encounter in attempting to uphold that proceeding. The County Court has no general jurisdiction in equity, and the legislature has not conferred upon it the cognizance of the liquidation of the affairs of corporations, whether insolvent or voluntarily dissolved. Even in the case of a valid direction to apply the proceeds of real estate ordered to be sold, the court could not, as I think, execute the duty through the agency of a receiver. The statute distinctly declares that the court is to direct the application of the moneys *by the corporation.* If the corporate officers should misbehave in performing or neglecting to perform this duty, it would belong to the Supreme Court, which has general jurisdiction of trusts and trustees, to grant the proper relief. It is very plain, and I have assumed throughout, that the provision of the Code, to which I have referred, goes no further than to confer upon the County Court the precise jurisdiction formerly vested in the chancellor under the general act for the incorporation of religious societies. The judiciary act gave the authority to the County Court in the same language used in the general act. (*Laws* 1847, *p.* 643, § 28.) When the Code, in terms, conferred jurisdiction on that court in the cases of "the mortgage or sale of real property, situated within the county, of a religious corporation, and the disposition of the proceeds thereof," nothing further, I am satisfied, was meant than to substitute the County Court in the place of the chancellor in respect to this special jurisdiction.

That part of the judgment appealed from which declares null and void the resolution reducing the number of trustees

from six to four was correct. According to the report of the referee, it was passed at a meeting of the persons who had associated together as the Plymouth Church, and those worshiping with them, held in the edifice formerly belonging to the First Congregational Society. The fact that the persons who participated in this act had been members of the original organization, and that the election took place in the church, does not make it valid unless in other respects it conforms to the act. A vote to reduce the number of trustees may be passed at an annual meeting, and such meeting is to be notified, by at least a majority of the trustees, to the minister, if there be one, and if not to certain other officers of the church. (*Act*, §§ 3, 6.) I infer from the report that this notice, as to the meeting in question, if given by a majority of the trustees, which is not probable considering the manner in which they were divided, was served on the minister or other functionary of the Plymouth organization. But, however this may be, the statements of the report preclude the idea that the members not belonging to the new organization were allowed to take any part in the proceeding. They would have no right to attend a society meeting of the Plymouth Congregational Church as such; and if such notices were given and such forms adopted as would render the assemblage a meeting of the First Congregational Society, it was incumbent on the defendants, if they would sustain the proceeding, to show it. *Prima facie*, a meeting of the Plymouth *Church* was not a meeting of the First Congregational Society.

It is unnecessary to consider whether that part of the judgment declaring inoperative the act of the party to which the plaintiffs belong, by which it was professed to vacate the offices of their opponents, can be sustained; for the plaintiffs have acquiesced in the judgment by not appealing, and the defendants are quite content with that portion of the judgment.

For the reasons which have been stated, I am in favor of affirming the judgment of the Supreme Court.

COMSTOCK, J. (who had been consulted while at the bar), took no part in the decision; JOHNSON, Ch. J., and STRONG, J., expressed no opinion; all the other judges concurring,

Judgment affirmed.