THE PEOPLE OF THE STATE OF NEW YORK *ex rel.* EDWARD COPPERS, GEORGE COPPERS, AND FREDERIC COPPERS, RESPONDENTS, *v.* THE TRUSTEES OF ST. PATRICK'S CATHEDRAL IN THE CITY OF NEW YORK, JOHN KELLY AND OTHERS, TRUSTEES AND OFFICERS OF SAID CORPORATION, RESPONDENTS AND APPELLANTS.

*Receipt for the purchase price of a lot in a cemetery—when the rights of the vendee are subject to the rules and doctrines of the church, with which the cemetery is connected—power of an officer of the cemetery to agree that the lot may be used without regard to such rules—in what cases a mandamus should not issue.*

The defendant is a corporation created by chapter 239 of 1817, and is authorized to hold certain lands in Queens county for burial purposes; it is attached to the Roman Catholic Church, the rules and doctrines of which forbid the burial, in consecrated ground, of the body of one who was not a Roman Catholic, or who was a member of the Masonic fraternity.   On December 1, 1873, the defendant executed and delivered to one Dennis Coppers an instrument, of which the following is a copy:

> OFFICE OF † CALVARY CEMETERY, }
>       NEW YORK, DEC. 1, 1873.     }.
>
> Received from Mr. Dennis Coppers, seventy-five dollars, being the amount of purchase money of a plot of ground, 8 feet by 8 feet, in Calvary Cemetery.
> $75.                    D. BRENNAN,
>                               *Superintendent of Office of*
>                                     *Calvary Cemetery.*
> Section 7.                              Plot D.
> Range 35.                       4 Graves, 5, 6, 7, 8.

Thereafter, and prior to August, 1879, the mother, wife, sister and two children of the said Coppers, all of whom were Roman Catholics, were buried in the said plot.

In August, 1879, Coppers, being at that time a Freemason, died, his funeral services being held, as directed by his will, in an Episcopal church,

under the direction and management of the Masons. The defendant having refused to allow the body to be buried in the plot for that reason, though the usual fees and charges for digging the grave had been paid to and accepted by its officers, the plaintiffs, his three brothers, applied for a mandamus to compel the defendant to have the grave opened, and to allow the body to be deposited therein. Coppers left two children, one nine and the other thirteen years of age. His will had not, at the time of the application, been admitted to probate.

*Held,* that the instrument delivered by the defendant to Coppers was not a conveyance nor a grant, nor did it operate to vest the title of the said plot in him, nor would a court of equity have compelled the defendant, on his application, to execute and deliver to him an absolute conveyance of the plot.

That, in determining the nature of the contract, the relative situation of the parties and the surrounding circumstances were to be considered.

That the instrument operated as a certificate of his right to use the lot for burial purposes only, such use to be subject to and in conformity with the established rules and by-laws of the corporation, in so far as they were not in violation of any law.

That the application should be denied.

Where a party applies for a burial lot at the cemetery of a distinctively Roman Catholic cemetery, it is with the tacit understanding that he is either a Roman Catholic, and as such eligible to burial therein, or that he applies in behalf of those who are in communion with that church.

*Quære,* as to whether the superintendent of the cemetery could, under his ordinary powers, agree with the applicant that the latter should have the right to use the lot, without regard to the rules and usages of the church to which the cemetery association was attached.

*Held* further, that as the relators were neither the legal representatives, next of kin, or assignees of the deceased, they could not enforce any rights he might have acquired under his contract with the defendant.

The cases in which the writ of mandamus will issue, considered; and its use in this case disapproved of, by Barrett, J.

Appeal from an order granting a peremptory mandamus to compel the defendants to open or cause to be opened a grave in a certain plot of ground purchased, or alleged to have been purchased, by one Dennis Coppers, in his lifetime, in Calvary Cemetery, for the purpose of enabling the relators to inter the body of the said Dennis Coppers therein.

The proceeding was originally instituted by three brothers of the deceased, his nearest next of kin, except two children, one nine and the other thirteen years of age, against " Calvary Cemetery, John Kelly, Hugh Moore, and James O'Rorke, Trustees and officers of the said corporation, exercising the duties and functions of such officers, and being the committee on cemeteries of such corporation,

as such officers, Trustees, and committee," but by stipulation of counsel and by the order of the court, "The Trustees of St. Patrick's Cathedral, in the City of New York" were thereafter substituted as respondents therein. The defendants are a corporation created by chapter 239 of the Laws of 1817 of this State, and are thereby empowered to hold certain real estate for the purposes mentioned in the said act, and among others "the said Cathedral and burying place thereto adjoining." By virtue of chapter 87 of the Laws of 1864, the defendants also hold certain lands in the County of Queens for burial purposes, and those lands are known as "Calvary Cemetery."

On the 1st day of December, 1873, the defendants executed and delivered to the said Dennis Coppers, who was then living, but is now deceased, an instrument in writing, in the words and figures following, to wit :

OFFICE OF † CALVARY CEMETERY,
NEW YORK, Dec. 1, 1873.

Received from Mr. Dennis Coppers seventy-five dollars, being the amount of purchase money of a plot of ground, 8 feet by 8 feet, in Calvary Cemetery.

$75.                            D. BRENNAN,
                                  *Superintendent of Office of*
                                  *Calvary Cemetery.*

Section 7.                            Plot D.
Range 35.                            4 Graves, 5, 6, 7, 8.

Thereafter, and prior to August, 1879, the mother, wife, sister and two children of Coppers, all of whom were Roman Catholics, were buried in the said plot.

Dennis Coppers departed this life on the 14th of August, 1879, at Hoboken, in the State of New Jersey, and, by his last will and testament, directed that his body should "be buried in Calvary Cemetery, New York, with or near the remains of my mother, and in the burial lot of ground now owned by me there." In such will he further said : "I do hereby declare my wish and desire to be that my funeral services be had and held in some Protestant Episcopal Church, and that such services and

funeral shall be under the direction, control and management of the order of Ancient Free and Accepted Masons."

On the 16th day of August, 1879, the undertaker who had charge of the burial, at the request of the relators and plaintiffs, made application at the office of the cemetery to have a grave opened in the burial plot purchased as before mentioned, and paid to the parties in such office the sum of seven dollars for the labor of such opening, which money was accepted, and a receipt given therefor. On the succeeding day (August 17, 1879), upon the arrival of the funeral procession with the body of Dennis Coppers, the interment in the burial plot and in the grave which had been prepared was refused and forbidden, and permission given to place the same temporarily in the receiving vault of the cemetery, from which its removal and burial elsewhere than in the lot of deceased were threatened, when an action to restrain the removal of the body and these proceedings were commenced for the objects before stated.

The interment of the body was forbidden because such burial would be contrary to the doctrines of the Roman Catholic Church, which, it was claimed, forbid the burial in consecrated ground of the body of a non-Catholic, or of one who was a member of the Masonic fraternity.

The opinion of Westbrook, J., at Special Term, is reported in 7 Abb. New Cas., at page 121.

*T. James Glover* and *T. G. Barry*, for the appellant. No court has power or jurisdiction to issue a mandamus to enforce the specific performance of a contract. (3 Bl. Com., 110; Bac. Abr., Mandamus; *Parker* v. *The Judges of the Circuit Court of Md.*, 12 Wheat., 541; 2 Johns. Cases, 2 ed., 217, note; Crary's Special Proceedings, 271.) The relator must have a clear legal right to have what is asked for in his writ. If his title is doubtful, that is a complete answer to his demand. (*The People, &c.* v. *Supervisors of Chenango Co.*, 1 Kern., 563; *The People, &c.* v. *The Canal Board*, 13 Barb., 444; *The People, &c.* v. *Supervisors of Greene Co.*, 12 Barb., 217; *The People, &c.* v. *Corporation of Brooklyn*, 1 Wend., 324; *The People, &c.* v. *Supervisors of Co-*

*lumbia Co.*, 10 Wend., 366; *Reeside* v. *Walker*, 11 How. U. S.,
272; *The People, &c.* v. *Wardell*, 71 N. Y., 172; *The People, &c.*
v. *Sups. Greene Co.*, 64 N. Y., 600; *The People, &c.* v. *G. E.
Church*, 53 N. Y., 109.) In practice a mandamus is an action at
law between private parties. (Per TANEY, Ch. J., *Kentucky* v.
*Denison*, 24 How. U. S., 97; *The People* v. *Baker*, 35 Barb., 102;
*The People* v. *Sup. Westchester*, 15 Barb., 613.) There must be
not merely a legal right, but there must be no other legal remedy, to
justify the granting of the writ. (*The People* v. *Mead*, 24 N. Y.,
120, 122; *Commonwealth* v. *Rosseter*, 2 Binney, 360; *Reg.* v.
*Trustees of B. & W. Turnpike*, 16 Eng. L. & Eq., 276; *The
People* v. *Sup. of Chenango*, 1 Kern., 573, 574; *The People* v.
*Mead*, 24 N. Y., 121, 124.) Sepulture in churchyards and in pri-
vate cemeteries belonging to churches, though paid for, never
created or implied any right or title to the land; it was a privi-
lege to be used in the mode permitted by the religious society.
(*Bryan* v. *Whistly*, 8 B. and C., 288; *Wood* v. *Leadbetter*, 13 M.
and W., 838; *Pitkin* v. *L. I. R. R.*, 2 Barb. Ch., 230; *Brown* v.
*Woodworth*, 5 Barb. Ch., 550; *Mumford* v. *Whitney* 15 Wend.,
380; *Wolf* v. *Frost*, 2 Sandf. Ch., 72.)

*C. W. Brooke*, for the respondent.

BARRETT, J.:

The consideration of the important questions presented by this
appeal should be approached with a clear understanding of the
relations of the respective parties to each other and to the de-
ceased.

It is conceded that the relators are neither the legal representatives,
nor, strictly speaking, the "next of kin" of the deceased Mr. Dennis
Coppers. They are not corporators of the defendant corporation,
nor connected in any manner with the church whose temporalities
are represented by such defendant. The same was true of the de-
ceased. The defendant corporation was created by chapter 239 of
the Laws of 1817. It is not to be regarded as an ecclesiastical cor-
poration in the sense of the English law, but as belonging to
a class of civil corporations, to be controlled and managed accord-

ing to the principles of the common law, as administered by the ordinary tribunals of justice. (*Robertson* v. *Bullions*, 11 N. Y., 257.)

Thus it is apparent that we have to deal with a matter of simple contract between an individual and a corporation, and to determine the question of right by the application of ordinary legal rules. Now what is the claim of the relators? In brief, that their deceased brother purchased and paid for a burial plot in the defendants' cemetery, that consequently they had a right to place his remains therein; that such right has been denied them by the defendants; and that a mandamus should issue to compel its enforcement. In support of this claim, the relators are bound, under established rules, to show a clear legal right, and the absence of a plain and adequate legal remedy. (*People* v. *Hawkins*, 46 N. Y., 10; *People* v. *Supervisors of Chenango*, 11 N. Y., 563; *Exparte Lynch*, 2 Hill, 45; *People* v. *Supervisors of Columbia Co.*, 10 Wend., 366; *People* v. *Supervisors of Greene Co.*, 64 N. Y., 600; *People* v. *Wardell*, 71 N. Y., 172.) This legal right must be complete, not inchoate. (*People* v. *Trustees of Brooklyn*, 1 Wend., 318.) It must also be vested *in the relators*. (*People* v. *Collins*, 19 Wend., 65.) This last rule is applicable, where, as here, it is sought, by mandamus, to enforce some matter of private interest. "In such case," said COWEN, J., in *People* v. *Collins*, "the title to relief, at the suit of the relator, must appear." In matters of public right, it is otherwise. The question, therefore, is whether a clear legal right has been shown. That depends, first, upon the title acquired by the deceased; and, second, upon the special position occupied by the relators.

As to the first, it is undisputed that Dennis Coppers never received a deed or other conveyance in writing of the plot in question. He therefore had no title in fee simple. No estate or interest in the land ever passed to him (2 R. S., 134, § 6), nor, for the same reason, did he acquire an easement. An easement always implies an interest in the land in or over which it is to be enjoyed. (Washburn on Easements & Servitudes, 5.) It lies in grant, and a freehold interest in it cannot be created or passed otherwise than by deed. (*Hewlins* v. *Shippam*, 5 Barn. & C., 221.) What evidence, then, of legal right, had the deceased? A simple receipt, signed by the

Superintendent of the " cemetery office," *unsealed,* acknowledging the payment, by Coppers, of $75, with the following explanatory addendum, *upon which the whole case rests :* " Being amount of purchase money of a plot of ground, eight feet by eight feet, in Calvary Cemetery." Beneath the signature, appear the following words and figures: " Section 7, range 35 ; plot D. 4 graves, 5, 6, 7, 8." This is the whole of it.

The contention is, that, as this receipt identifies the plot, acknowledges payment of the purchase-money, and was followed by the exercise of the right of burial, it should be treated as a deed in fee, " under the maxim that what was agreed to be done, and what ought to be done, shall, for the advancement of justice, be regarded as done." One difficulty with this position is, that the statute stands in the way. It provides a specific means of acquiring title to land, and declares that no estate or interest shall be " created, granted, assigned, surrendered or declared " in any other manner. Another objection is, that the receipt does not clearly indicate that what has been " agreed to be done, and what ought to be done," is the execution and delivery of a deed or conveyance in fee simple absolute, or even of a base fee. When " purchase-money " is spoken of, in connection with church pews, vaults and burial plots, it by no means points to such a transaction as might be implied from the use of those words between an ordinary vendor and vendee. On the contrary, it imports nothing more than the purchase of a right to the appropriate use. It is only where formal conveyances are made, expressly granting the fee simple of an estate in land, for the purpose of sepulture (as in the *Brick Church Case,* 3 Edw. Ch., 169), that an intention to sell and dispose of the land will be admitted. Even where a certain specific piece of ground in a church-yard was conveyed, with the usual formula of " heirs and assigns forever," it was held that no title to the freehold passed, but a mere right of burial, standing " upon the same footing as the right of public worship in a particular pew of the consecrated edifice." (*Richards* v. *Northwest Prot. Dutch Church,* 32 Barb., 42.) It is well settled that pew rights, though acquired by deed, are only easements, and that the pew-holder has no title to the freehold. (*Voorhees* v. *Presbyterian Church of Amsterdam,* 8 Barb., 137 ;

*Cooper* v. *First Presbyterian Church of Sandy Hill*, 32 Id., 222; *Wheaton* v. *Gates*, 18 N. Y. 404.)

Even as to independent cemeteries it was held, in *Buffalo City Cemetery* v. *City of Buffalo* (46 N. Y., 505), that a conveyance for burial purposes only confers upon the grantee a right to use for the purposes of interment. "No such estate," said FOLGER, J., " is granted as makes him an owner in such sense as to exclude the general proprietorship of the association. The association remains the owner in general, and holds that relation to the public and to the government, *while*, subject to *this*, the individual has a right, exclusive of any other person, to bury upon the subdivided plat assigned to him. *He holds a position analogous to that of a pew-holder in a house of public worship.*" (See also *Windt* v. *German Reformed Church*, 4 Sandf. Ch., 471.)

When distinct words of grant have been thus limited, *owing to the nature of the purchase*, how is it possible to infer, from language merely characterizing the payment an intention to convey an estate in fee simple or a base fee? And how is this intention aided by the fact, treated by the relators *as evidence of possession under the receipt*, that the deceased was permitted to and did use the plot in question? That fact has no significance, when dealing with the question of intent. It is as consistent with the idea of an easement or mere parol agreement for the rights of burial, as with that of an estate in fee.

We have thus far considered the case as though the receipt were to be treated as, at least, a contract. But it is not, in any just sense, the contract between the parties. In fact, it is not a contract of sale at all. It possesses none of the features of an executory agreement. It contains no stipulation to sell or to buy, specifies no terms or conditions, and embodies no covenant to convey. It is simply a receipt for the purchase-money of a plot of ground. It *presupposes an existing contract*. In *Filkins* v. *Whyland* (24 N. Y., 338), this effect was explicitly given to a receipt for the purchase-money of a horse. WRIGHT, J., said: " The paper cannot be read as a present agreement of sale. It contains no stipulations to sell or to buy, nor declares any present undertaking by either party. The vendor acknowledges payment, but he does not profess by the

writing to sell. The vendee does not execute, but accepts it. . . . The paper does not by its own force at the time of its execution, vend the horse or assume to do so. It admits that a sale has been had, but does not effect one. . Had it read, 'Received of C. B. F. $150, in payment of one horse bought by him of me,' it would not have been doubted that it was a mere receipt or acknowledgment of payment, *and not the contract of purchase.* . . . . That can hardly be named a written contract which contains no contract stipulations, but simply recites the fact of a past sale, as preliminary to and explanatory of, the admission of payment." (See also *Allen* v. *Pink*, 4 Mees. & W., 140). In *Hotchkiss* v. *Mosher* (48 N. Y. 478), the same rule was applied to a certificate of deposit issued by a bank.

The importance of these considerations consists in the effect given to the receipt in question by the court below. It was treated as the completed contract between the parties, as embodying the entire agreement, consequently subjecting the defendants to the rigid rule of law, that nothing *dehors* the instrument could be taken into consideration. It was conceded by WRIGHT, J., in *Filkins* v. *Whyland* (*supra*), that if the receipt amounted to a contract, parol evidence of a warranty of soundness was inadmissible. "When a contract is consummated by writing," said that learned judge, "the presumption of law is that the written instrument contains the whole of it. . . The agreement to which the contractors bound themselves, is to be ascertained exclusively by the writing." The fallacy of the relator's position consists in treating the receipt as an iron-clad contract, containing the entire agreement of the parties, whereby the defendant conferred upon the deceased, at the very least, an absolute and unqualified right of burial, without reservation or restriction of any kind. We freely concede the relator's deduction from these premises. The defendants, as we remarked at the outset, are to be treated, in all matters of contract, simply as a civil corporation, and must abide by their grants or covenants. Where those grants or covenants are clear, explicit and unambiguous, they cannot be varied or explained by ecclesiastical polity, usages or laws. But, with respect and diffidence, we are compelled to deny the premises. The receipt is *not* such a contract as is claimed. The real contract rests in

parol, and is to be implied from the surrounding circumstances, in connection with the receipt and the subsequent use of the plot. In *Robertson* v. *Bullions, supra,* it was argued that the nature of the trust may be ascertained, not only from the language of the deeds by which the property is conveyed, but may be inferred from the tenets, faith and practice of the creators of the fund. " This doctrine," said SELDEN, J., "if it means anything more than that, where the language of a deed is ambiguous, it may be explained by proof of the surrounding circumstances, I deny." If then the surrounding circumstances may be resorted to, when the language of a deed is ambiguous, *a fortiori,* may they where there is nothing whatever to throw light upon the contract, except a paper admitting the receipt of the purchase-money.

What then are the surrounding circumstances of the present case ? Clearly the rules, relations and customs of the defendant with regard to burials in its cemetery. Every applicant is presumed to know, that it is not an ordinary cemetery, incorporated and conducted for the purpose of general and indiscriminate burial, but a corporation attached to the Roman Catholic Church, with power to make lawful rules, regulations and by-laws. In fact, that the cemetery is part of the temporalities of this great church. It is in evidence, *without dispute,* that under the rules and usages applicable to the cemetery in question, the burial of non-Catholics or of Freemasons is forbidden, and that such right is reserved exclusively for Roman Catholics dying in communion with the church. It also appears that the cemetery was duly consecrated by appropriate rites and ceremonies, that the trustees are members of the church, spiritually subject to its laws, usages and discipline, and, in substance, that the business affairs of the cemetery were and are being conducted in good faith by these trustees to give effect to such laws, usages and discipline. In the absence of any special contract, excluding this *status* by the omission of a restriction in a formal deed or agreement, the presumption is a just and reasonable one, that such *status* was a part of the transaction, and that the laws and usages, to which we have referred, were understood by both parties as lying at the very root of the negotiation and pervading it throughout.

Where a party applies for a burial plot, at the office of a distinctively Roman Catholic cemetery, it is with the tacit understanding that he is either a Roman Catholic, and as such eligible to burial, or at least that he applies on behalf of those who are in communion with the church. The entire business is transacted on that basis. The parties may, notwithstanding, contract, if they choose, in such a manner that any one, even a Buddhist, Mohammedan, or avowed Atheist, will have a legal right to sepulture in the plot ; and the law will give effect to their bargain. But to accomplish such an object, to contract in entire disregard of the church laws, usages and customs applicable to the cemetery, to give the vendee an absolute right to disturb what is believed to be the spiritual harmony of the surroundings, a very different instrument from this simple receipt would have to be secured. We might go further, and say that such an instrument, to be of any validity, should emanate from some one duly authorized to make a contract, so unusual and contrary to the spirit of the institution. It might well be doubted whether the superintendent of the " cemetery office " could confer such a right under his ordinary power, which seems to be limited to the issuing of receipts similar to that under consideration. (*Adriance* v. *Roome*, 52 Barb., 399 ; *Dabney* v. *Stevens*, 10 Abb. Pr. N. S., 39.)

It is quite clear to us that, in no aspect of the case, was there a legal right. There was no conveyance of an estate in fee, none of an easement. There was not even a written contract for a right of burial. At most, there was a parol understanding which embraced conditions excluding the deceased. Even if the corporate rules and customs were not engrafted upon the agreement, still there was *no legal right*, for such agreement was void under the statute of frauds. It is even doubtful whether equity would decree a specific performance. Payment of the consideration will not in general be deemed such a part performance as to relieve a parol contract from the operation of the statute. (*Rhodes* v. *Rhodes*, 3 Sandf. Ch., 284.) "That doctrine," says Mr. Story (Eq. Juris., § 760), "is now finally overthrown. " The reason for this," said the vice chancellor, in *Rhodes* v. *Rhodes*, "is, that in such case, the repayment of the consideration will place the parties in the same situation in which they were before." The question, if depending upon possession, as we

have already seen, is by no means free from doubt. Besides, the rule upon that head seems to have been intended to cover cases where, unless the agreement is fully performed, a fraud would be put upon the vendee,—as where the latter builds a house or makes improvements in reliance upon the parol agreement. In an action for a specific performance, the rule would also have to be encountered, that the contract must be established by competent and satisfactory proof, which must be clear, definite and certain (*Lobdell* v. *Lobdell*, 36 N. Y., 327). Could it be said that the right of a non-Catholic or Mason to burial in the plot was established so clearly and satisfactorily as to justify an equity decree specifically enforcing such a demand? Be that as it may, and without expressing any decided or definite opinion upon the point, we may say that it is not the province of mandamus to enforce a doubtful equity, or aught save a clear legal right.

Indeed, it has been expressly held, that where the right is an equitable one, and such as is not enforceable at law, mandamus will not lie. (*Rex* v. *Marquis of Stafford*, 3 Term R., 646; *Reg.* v. *Trustees*, 16 Eng. L. & E., 276.) Mandamus is an extraordinary remedy, to be resorted to with great caution. It cannot be substituted for the ordinary and appropriate legal remedies. If a pewholder be disturbed in his right, he may have trespass *quare clausum* (*Jackson* v. *Rounseville*, 5 Metc., 127), or an action on the case. (*Rossiter* v. *St. Mary's Church*, 2 Binney, 360.) In the latter case, it was in substance argued that there could be no compensation for a denial of the right *thus* to worship, and consequently that there was no *adequate* legal remedy; yet, the court refused the mandamus to compel the trustees to restore the relator to the possession of his pew. Mandamus is appropriate where a public duty is imposed, or some act specifically directed by statute. But it will not lie to enforce mere private contracts (*Exparte Robbins*, 7 Dowl. P. Cas., 566.) However special or peculiar their nature. (*Rossiter* v. *St. Mary's Ch.*, *supra*.) This principle might be enforced by many illustrations with regard to special works of art, rare books, prized relics, heirlooms, and other things peculiarly within the domain of feeling, sentiment, or faith. Nor are illustrations wanting as to similarly valued rights apper-

taining to realty. . The law does not provide remedies all sufficient to satisfy every need of the heart. This it cannot .do. The remedy may be adequate in a legal sense, yet entirely inadequate to satisfy the earnest desire of the suitor. .

It comes to this: if the party have title, he may bring ejectment; if some special right or interest, an appropriate action for the violation of such right or deprivation of such interest. Or, in a proper case, the strong hand of equity may be interposed to compel a party to do or refrain from doing some specific act. While these remedies exist, the great prerogative writ of mandamus will not be set in motion. What we conceive to have been the error of the court below on this head, was the assumption that the respondent was " bound by law " to open this grave and permit this burial. In a general sense, a person may be said to be bound by law to do that which he has contracted to do. But that is not the specific legal duty which entitles the party to a mandamus. It is disobedience of some statutory command, or of some specific requirement of law. Here the defendant, if bound at all, was so bound by *contract*, and not by *law*.

Further, the relators have no *status*. They are neither the legal representatives, next of kin, nor assigns of the deceased. In legal contemplation, they are strangers to the alleged contract sought to . be enforced. It may be their duty to see to the proper burial of their brother. That right may, as contended, be exclusively vested in them as adult next of kin. (3 Edw. Ch., 155.) But, where the right to burial, in a particular place or manner, depends upon legal rights vested in the deceased, such rights can only be enforced by those to whom they have descended. We have seen that the title to relief must be vested in the relators. The reason is obvious. The people are but nominal or formal parties. In practice, the mandamus is analogous to an ordinary action at law between private parties. (See *Commonwealth of Kentucky* v. *Denison*, 24 How. U. S. 66.)

It is said, that when the present proceedings were instituted, the will of the deceased had not been probated, and that there was urgent necessity for haste. But legal rights cannot be conferred by the exigencies of the particular case. And, after all, the ques-

tion of time in legal controversies is one of degree. For instance, a legal or equitable action, instituted by proper parties, could readily have been tried and decided while this mandamus proceeding has been pending. Mandamus is not necessarily summary. There may be an alternative writ, followed by trial of issues of law or fact, and supplemented by the due course of appeal. Pending a legal or equitable action, the remains of the deceased could as well have rested in the receiving vault as they do now.

We may add that, pending this controversy, they could as well have rested in any other receiving vault as in that of this defendant.

The fact that a sum of money was paid for the opening of the grave does not call for special remark. It neither adds to nor takes from whatever rights flow from the material facts existing at Mr. Coppers' death. Besides, the clerk accepted the fee in reliance upon the understanding previously referred to, and in entire ignorance of the fact as to Mr. Coppers' position. Even if it were clear that it was the relators' money, a mandamus will scarcely issue to compel the defendant to open a grave because it has contracted for a specific sum to perform that service.

In every aspect of this case, we think that a mandamus should not have been granted.

The order appealed from must be therefore reversed, with $10 costs and disbursements of the appeal, and the motion for a mandamus be denied, with $10 costs.

Brady, J., concurred.

Davis, P. J.:

Without expressing concurrence in or dissent from all the views of my brother Barrett in his able and exhaustive opinion, I concur in his conclusion that the order of the court below must be reversed. In my opinion, the instrument called a receipt and acknowledging payment of the consideration and identifying the plot and the use to which the same was to be devoted, accompanied by the actual occupancy on the part of Dennis Coppers, was sufficient to vest him with certain rights of property in the use and enjoyment of the lot of which he could not be dispossessed or deprived. But it was not

a grant or conveyance. It was rather a certificate, of his interest in the cemetery owned by the corporation, and of his right to the use of the same *sub modo* and in conformity to the established rules and by-laws of the corporation in so far as they were not in violation of any law. I think it cannot be doubted that religious corporations may lawfully establish cemeteries and burying-grounds exclusively denominational, and guard and protect the same by such rules and regulations as make effective the objects and purposes of their organization. When established, the corporation may impress upon them rules and regulations operating equally upon all who use or seek to use the privileges of burial within them. Whoever purchases a right of burial and takes a certificate of his right which does not grant or convey some absolute interest or title free from such rules and regulations, must be deemed to take subject to them, and, in short, to have contracted with the corporation that his rights shall be subject to and controlled by such lawful rules and regulations as the corporation may have prescribed.

The principle that should govern the case would be quite analogous to that which applies to the owners or renters of pews in church edifices, who must be deemed to take the right of use in subordination to such by-laws or regulations as the society owning the fee has thought proper to establish. If, then, a Presbyterian, Episcopalian, or any other religious denomination becomes the owner of a cemetery which it devotes to burial purposes, there is no rule of law to prevent its dedication of the same exclusively to persons in communion with its own church or denomination; and however much its sectarian exclusiveness may be criticised by those hostile to such restrictions, nevertheless in law the action of the corporation is not invalid. In this case, the rights of Dennis Coppers, though in my judgment valid, were restricted by rules and regulations which affected and limited them to uses within the rules sought to be enforced against them. If I were called upon to criticise the good sense and reason of the rules, I should certainly differ from the appellants, for I can see no good reason why the fact that Coppers was in his life a Freemason should prevent the burial of his body, after death had separated him from all such societies, by the side of his wife and children. It may have been a harsh and unchari-

table thing to have done; but the law is not changed because the consequence of upholding it seems severe and cruel.

The religious corporation owning the cemetery have seen fit to make the rule. The purchaser took his rights subject to it. A rule which cannot be enforced is of no value. If valid to be made, it is valid to be enforced; and hence, as its invalidity cannot be established, the courts cannot interfere by mandamus to prevent its enforcement.

I concur, therefore, in the result.

Order reversed with $10 costs and disbursements, and motion for a mandamus denied with $10 costs.